Ex parte, in the matter of Duncan N. Hennen.

Mandamus. Motion for a rule on the district judge of the eastern district of Louisiana, to show cause why a mandamus should not be issued requiring him to restore Duncan N. Hennen to the office of the clerk of the District Court. The petition states the appointment of the relator to the office of clerk of the District Court, in 1834; the full and complete performance of his duties as clerk of the Court, until May 1837; the acknowledgment of the fidelity and capacity with which the duties of the office were performed, stated in writing by the district judge; and the appointment of another person to the office, from personal motives, and the influence of friendship, and a knowledge of the capacity of the person appointed to perform the duties of the office. The petition also states the performance of the duties of clerk of the Circuit Court of the eastern district of Louisiana, under the appointment as clerk of the District Court, and the offer to perform those duties after his asserted removal as clerk of the District Court; and that the judges of the Circuit Court being divided in opinion as to his right to exercise the office of clerk, the business of the Circuit Court was entirely suspended.

The appointment of clerks of Courts, properly belongs to the Courts of law; and a clerk of the Court is one of those officers contemplated by the provision in the Constitution, giving to Congress the power to vest the appointment of inferior officers as they think proper. The appointing power designated by the Constitution, in the latter part of the second section of the second article of the Constitution, was no doubt intended to be exercised by the department of the government to which the officer to be appointed most appropriately belonged.

It cannot be admitted that it was the intention of the Constitution, that those offices which are denominated inferior offices should be held during life. In the absence of all constitutional or statutory provision as to the removal of such officers, it would seem to be a sound and necessary rule to consider the power of removal as incident to the power of appointment.

The tenure of ancient common law offices, and the rules and principles by which they are governed, have no application to the office of the clerk of a District Court of the United States. The tenure, in those cases, depends in a great measure upon ancient usage. But in the United States there is no ancient usage, which can apply to and govern the tenure of offices created by the Constitution and laws. They are of recent origin, and must depend entirely on a just construction of our Constitution and laws: and the like doctrine is held in England, where the office is not an ancient common law office, but of modern origin, under some act of Parliament. In such a case, the tenure of the office is determined by the meaning and intention of the statute.

The law giving the District Courts the power of appointing their own clerks, does not prescribe any form in which this shall be done. The power vested in the Court, is a continuing power; and the mere appointment of a successor would, per se, be a removal of the prior incumbent; so far at least as his rights were concerned.

The Supreme Court can have no control over the appointment or removal of a clerk of the District Court; or entertain any inquiry into the grounds of the removal. If the judge is chargeable with any abuse of his power, the Supreme Court is not the tribunal to which he is answerable.

THE Court having decided that the rule granted at the August term of the Court, held by Mr. Chief Justice Taney, should be discharged; the counsel presented another petition to the Court, setting forth the same facts as those stated in the petition, the matters of which are set forth in the report of the preceding case, with others.

The additional facts stated in the petition were, that the petitioner is in the full and undisputed possession of the seal of the Circuit Court for the eastern district of Louisiana, and of the records of the said Circuit Court.

That there is now pending in said Circuit Court, a cause in which the petitioner, a citizen of the state of Louisiana, is the plaintiff, and Rezin D. Shepherd, a citizen of Maryland, is the defendant; that the value of the property in controversy between petitioner and said Shepherd, exceeds in amount the sum of six thousand dollars in cash. That in consequence of the disagreement between the judges of the Circuit Court, and the refusal of Judge Lawrence to allow the petitioner, the true and lawful clerk of said Court, to perform the duties thereof, the petitioner is prevented from proceeding in said cause; and the petitioner is prevented from bringing the said cause up to this Court for its final decision.

The petitioner further states, that the judges of the said Circuit Court continue to differ in opinion, as to the legal rights of the petitioner and said John Winthrop to the offices of clerk of the District and Circuit Courts, so that no one does or can perform the duties of the office of clerk of the Circuit Court aforesaid; and that the suitors in said Court are thereby delayed, and the administration of justice therein wholly suspended; and the appellate jurisdiction of the Supreme Court of the United States over the judgments and decrees of said Circuit Court wholly suspended, and incapable of being exercised.

" All which evils are remediless at and by the ordinary proceeding before the said District or Circuit Courts, and can only be terminated and redressed by the interposition of this honourable Court, by its extraordinary process of mandamus."

The petition prays that the Court, after consideration, will award a writ of mandamus to be directed to the Honourable Philip K. Lawrence, judge of the District Court of the United States for the Eastern District of Louisiana, commanding him forthwith to restore the petitioner to his office of clerk of the District Court of the United States for the Eastern District of Louisiana.

By an agreement between the counsel for the relator and the judge of the District Court of Louisiana, the questions presented to the Court on the petition were argued; the usual notice being dispensed with.

The motion for a mandamus was argued by Coxe and Mr. Southard, for the relator, and by Mr. Gilpin and Mr. Jones, for the District Judge of Louisiana.

Mr. Coxe, with whom was Mr. Southard:—

The case, which it is proposed to submit to the consideration of the Court, is one equally novel and interesting. The principles which it involves are alike important to the parties on the record and to the public.

It is a case of the first impression; for although on a cursory and superficial examination, it may be thought to bear an analogy to others which have been heretofore and elsewhere discussed and disposed of, a more careful examination will make it perfectly apparent that it is now for the first time, in its naked simplicity, pre-

sented for investigation and decision. At all events, it is, beyond all doubt, now for the first time exhibited as the subject of judicial consideration.

The record presents a plain and unembarrassed case. In 1834 Mr. Hennen, the relator, was duly appointed to the office of clerk of the District Court for the eastern district of Louisiana. He accepted the appointment, took the oath of office prescribed by law, and gave a bond with sureties, approved by the judge, conformably to the provisions of the act of Congress. Of all these facts the record contains the most abundant evidence.

He continued to hold this office, and to perform its duties "methodically, promptly, skilfully, and uprightly," until the 18th of May, 1838; when he received from the Honourable Philip K. Lawrence, who then held the office of district judge, the letter which is contained in the record.

This letter demands the earnest attention of the Court.

1. It purports to be an act of removal of Mr. Hennen from the office which he held, and the appointment of Mr. Winthrop as his successor.

2. It contains the highest testimonials to the qualifications of every kind of Mr. Hennen for the office which he held, and the fidelity and skill with which he had discharged its duties.

3. It assigns, as the only reason for the exercise of the power with which he claims to be invested as a public officer, "a sense of duty, and feelings of kindness towards one, between whom and himself the closest friendship had ever existed." He considers the claims of his personal friend to every benefit in his power to confer in the exercise of his official functions, "as of a paramount character."

This letter, then, raises for the consideration of the Court three distinct propositions.

1. That, by law, the district judge possesses the power, acting ministerially, not judicially, to remove from office the clerk of the District Court.

2. That he may lawfully exercise this power, at his own absolute will, in the case of a public officer of acknowledged merit and undoubted qualifications; in the absence of any act of misfeasance or nonfeasance.

3. That he may lawfully employ a power confided to him as a public officer, for public purposes, as a means of gratifying the calls of private friendship; and that in the exercise of such an authority, he recognises the claims of personal friendship as of a paramount character.

Such are the doctrines promulgated by the learned judge. How far they are correct it is for this Court to pronounce. They are at least new, if they are not equally illegal. They are at least anti-republican, if they be not also unconstitutional.

1. The only source from which the power which is claimed can be derived, is the 7th section of the judicial act of 1789, (2 L. U. S.

59,) which provides that the Supreme Court and the District Courts shall have power to appoint clerks for their respective Courts. It is a power vested in these Courts, as Courts. Does it involve, by necessary implication, the power of removal.

The power of removal from office, as an incident to the power of appointment, has been much discussed as a political question; from the period of the first Congress to the present day. Although by many it is considered as a settled question, it is believed that a careful examination of the proceedings of that Congress will conduct us to the conclusion, that so far as regards the case at bar, if any authoritative opinion has been expressed, it is hostile to the power now claimed.

In the Congress of 1789, the question did arise, whether or not the President possessed the power of removing from office a head of one of the executive departments. The debate on that question elicited the best talents of the able men who then adorned the House of Representatives. As that debate has been sometimes erroneously reported, and as frequently misapprehended; it will be important to give to it a careful attention.

It originated in the House of Representatives, and grew out of a clause in the bill which provided for the organization of an executive department, to be styled the department of foreign affairs. This bill contained a clause, which provided that the secretary should be removable by the President. It appears to have been discussed in committee before the debate occurred in the House; and it was, therefore, not taken up in the House as entirely a new question, but one to which the attention of members had already been directed. The debate continued several days; and from the very full and accurate report recently furnished to the public, (1 Gales and Seaton's Register of Debates, 473,) four entirely distinct opinions may be perceived to have existed in relation to the subject.

1. That inasmuch as under the Constitution, the Senate were to participate in appointing to office, it must also have an equal participation in the act of removal. Messrs. White, Sherman, Jackson, Stone, Gerry, and others, maintained this doctrine.

2. That as the Constitution did, in terms, provide for the removal of officers, by the process of impeachment, for certain specified causes, removal in any other manner, or for any other cause, was impliedly excluded. Messrs. Smith and Huntingdon were among the most prominent who asserted this proposition.

3. That as Congress possessed the power of creating the office, it was competent for the legislative department to prescribe its duration; and the manner in which, and the power by whom, the officer might be removed. Messrs. Lawrence, Jackson, Lee, Sylvester, and others, concurred in this view of the subject.

4. That as an incident to the executive power, and a necessary means of enabling him to perform his own constitutional duties, the power of removal belongs exclusively and absolutely to the President, when no other tenure of office is prescribed. Messrs. Madison,

Boudinot, Ames, Sedgwick, Vining, Hartley, Clymer, Benson, Goodhue, Baldwin, and others, asserted this to be the true constitutional doctrine.

The decision of the House was finally had upon a motion to strike out the clause, which in terms conferred the power of removing upon the President, and inserting a clause which provided for a substitute for the principal officer, "whenever he shall be removed by the President, or in any other case of vacancy." The motion to strike out was carried by a vote of 31 to 19; and that to insert, 30 to 18. 1 Gales and Seaton's Debates, 600, 601. This decision of the House of Representatives was concurred in by the Senate, by the casting vote of the vice-president.

A difference occurred in regard to the organization of the treasury department, between the two houses; and it was finally adjusted by a species of compromise. The Senate receded from an amendment they had made to the House bill, which struck out the clause making the secretary removable by the President; and the House concurred in changing the title which, as originally drafted, designated the treasury as an executive department.

The proceedings of the Senate were at that period secret, and therefore there exists no record of the debates in that body. An examination, however, of the debate in the House, will show that substantially the decision was:—

1. That the power of appointment was a concurrent one, which the President and Senate exercised concurrently; and that this did not by implication vest the power of removal in these two distinct authorities, as growing out of the expressly granted power.

2. That the power of removal belonged to the President, not simply in consequence of his having an agency in the appointment, but as the executive of the nation, compelled to resort to agents as the instruments by which he was to perform his duties; and being responsible for the conduct of such agents, he must necessarily possess the power of appointment and removal, at his own single pleasure.

It is perfectly manifest, then, that these proceedings of the Congress of 1789, cannot justly be considered as a legislative exposition of the Constitution, that the power of appointment necessarily implies a power of removal. To the extent to which the case at bar would carry this doctrine, these proceedings give it not the least countenance.

It is equally apparent, that the arguments advanced on that occasion in favour of the executive power of removal, leave the case at bar untouched. While, therefore, we regard with great respect the opinions then promulgated by the fathers of the country and of the Constitution, and are disposed to leave them wholly unquestioned; the distinction between the question then decided, and that now under consideration, is widely different.

It is conceded, that in the exercise of a high political power, the President possesses, and ought to have, a large discretion on the

subject-of removal. As the executive magistrate of the country, he is the only functionary intrusted with the foreign relations of the nation. The secretary of state and foreign ministers are the agents through whom he performs these duties of his office. He is the commander in chief of the army and navy, and the secretaries of these departments are his agents in communicating his orders and instructions. Being responsible for the manner in which these high trusts are executed, he must, from the very nature of things, be at liberty to employ and dismiss at pleasure those whom he employs as his agents. The laws, therefore, which create those departments, expressly recognise this relationship and this control. Act of 27th July, 1789, establishing the department of foreign affairs; act of 7th August, 1789, establishing the department of war; and the act of 30th April, 1798, establishing the navy department.

Widely different is the relation which subsists between the Court and its clerk. The latter is in no respect the agent of the former. His duties are prescribed by law. He gives bond to the United States for the security of those whose interests may be affected by his malconduct. The Court which appoints him, is in no sense responsible to those who may be injured by his malpractices.

Another palpable difference exists between the cases The President may have occasion to exercise this power of removal summarily, in cases of great public exigency, and as a necessary means of preserving the country from impending danger or dishonour; and for causes the disclosure of which before he acted might involve the most serious consequences. Nor does any power exist to accomplish the same good, and to ward off these dangers, in any other mode. The Court, however, may arrest a clerk in his career of misconduct, may enforce obedience to his duties, may punish for misconduct, may remove for sufficient cause. This may all be done judicially. This will be again adverted to in the subsequent part of the argument.

The general proposition was advanced, but as confidently denied in the debate in 1789, that the power of removal was an incident of the power of appointment. It may be asserted that there is nothing either in the provisions of the Constitution, or in the principles of our institutions, which countenances the doctrine. By the express terms of the Constitution, the judges are independent of the appointing power. The President is appointed by electors, who, having performed their constitutional function, are extinct; and have no power or right to control the conduct of their appointee, or to remove him from his high office. Such, also, is the case with the vice-president. The senators are appointed by the state legislatures, and such appointment is irrevocable. The members of the House of Representatives, when once elected, are independent of those whom they represent. In truth, the principle is nowhere found, except in the executive department, and in the exercise of political power.

There is nothing in the office of clerk of a Court which requires the application of this principle to him. A Court, in making such

an appointment, exercises not a judicial, but a purely ministerial function. . Such was the understanding of the respondent himself in this case. He never would or dared to have assigned as his motive for exercising a judicial power in a particular mode, that it was done in obedience to the paramount duty imposed on him by the relations of private friendship. To assign such a reason for a judicial decision, would stamp it with condemnation. In performing this merely ministerial function, he was executing a merely naked power.

. A review of the causes which led to this provision in the judicial act, will corroborate these views. Courts were to be created co-extensive with the Union. Casualties might occur which would leave the office vacant, and the most serious consequences might result from leaving the place unfilled until the President could be notified of the fact, and make a new appointment. In the country from which we have borrowed so many of our constitutional and legal doctrines, the same practice extensively prevailed. It is believed it generally existed among the colonies. Wherever it did prevail, the power of appointment was considered as a naked power, which was exhausted by the act of itself; and then slumbered until another vacancy awakened it again to life.

As a general principle of the common law, in all cases of appointments under powers, the appointment is not revocable unless expressly made so at the creation of the power. When an appointment is made, the party takes, in contemplation of law, immediately from him who created the power. An officer thus created is the creature of the law which confers the power of appointment, and holds as if his name had been specifically mentioned in the statute. Shower, 523. Per Gregory, J.

Such powers and such exercises of them, and such results, are usual and familiar. The marshal or sheriff selects and summons jurors, but when once they have entered upon the performance of their duties, he cannot discharge them. In case of an insufficiency of numbers, or the setting aside a verdict, or their discharge without rendering a verdict, a new exercise of the authority being required, the power revives.

This general principle has been for a long series of years adopted in the English law as applicable to all concerned in the administration of justice; to the inferior and ministerial officers, as well as to the judges. Originally, the king had the appointment of all, for the Courts were emphatically his Courts. Per Holt, Shower, 528, 529. The appointing power was subsequently vested in the Courts themselves. Ibid. 130. 2 Inst. 425. But, as was distinctly asserted in Harcourt vs. Fox, Shower, 532, 535, the person having the power to make the appointment, having executed that power, hath done with the business; he hath no more to do with the officer; the clerk of the peace being in by that constitution which hath limited how the clerk shall be estated in his office. Ibid. 532. In the case of the Chief Justice granting offices in his gift, all that he had to do was to point out the person who should have the office. Ibid. 535. The

[Ex parte Duncan N. Hennen.]

same great judge commends the policy of this law : " it seems the public good was designed, for it was a great mischief to have the office so easily vacated." Ibid. 534.

In the course of his learned opinion, Lord Holt lays considerable stress upon other considerations which are equally applicable to the case at bar. He says, " I am the more inclined to be of this opinion, because I knew the temper and disposition of the parliament at the time when this act was made; their design was that men should have places, not to hold precariously or determinable at will or pleasure, but to have a certain durable estate, that they might act in them without fear of losing them." He also considered this expression of the intentions of the legislature as a contemporaneous exposition of the statute. It will be seen presently how stringent is the application of these principles to the case under consideration.

Second Hawkins, 100, b. 2, c. 10, s. 38, contains this general dictum in relation to some of the executive officers of the Court: " It seems clear, that the sheriff or steward having power to place a constable in his office, has, by consequence, a power of removing him." For this, he cites Bulstrode, 174. A reference, however, to the case reported by Bulstrode, shows that the decision was, that this power of removal could only be a removal for cause. According to the principles of the same law, an officer thus removed without cause, could be reinstated by the process of mandamus. Bulst. 174. 2 Hawk. 103. So in Massachusetts, it has been adjudged that a power to appoint a minister at all times, does not carry with it the power to remove. Avery vs. Inhabitants of Tyringham, 3 Mass. Rep. 160.

Such were the principles of law, of general policy, and of individual right, which prevailed when the judiciary act of 1789 was framed; and a reference somewhat in detail to the proceedings of that Congress will demonstrate, it is believed, the proposition that neither the judiciary committee who reported the bill, nor the Senate that passed it, nor the House which concurred, dreamed that they were conferring upon the district judge the power to remove the clerk, at his own mere capricious will.

The bill originated in the Senate. It was reported by the committee on the 12th of June, 1789, and the 22d of the same month was assigned for the second reading. It was taken up for consideration on that day, and was the subject for discussion during several consecutive days. While this bill was under the consideration of the Senate, that for the organization of the department of foreign affairs was under debate in the House. That bill was brought up to the Senate, and a similar motion to that which had been discussed in the House, was made. The judiciary bill passed the Senate on the 17th of July, before the other was finally acted upon. On the 18th of July, the question on the President's power of removal was carried by the casting vote of the vice-president.

The judiciary committee of the Senate consisted of Messrs. Ellsworth, Paterson, Maclay, Strong, Lee, Bassett, Few, Wingate, Carroll, and Izard. In the vote upon the question of the executive

power of removal, they stood : for striking out, Few, Izard, Lee, Maclay, and Wingate ; against it, Basset, Carroll, Paterson, Strong. It thus appears that of the nine members who reported the judicial bill, five entertained the opinion that the President had not the power of removing the secretary of state from office.

With what show of reason can it be inferred, in direct opposition to the opinions avowed by these gentlemen in that vote, that they believed that they were conferring by implication upon the judges of the District Court, the power of removing a clerk. With the views they had taken of the Constitution, it is impossible to believe that such a Construction of the law upon which they were employed, ever suggested itself to them. Experienced lawyers as they were, could they be supposed to innovate so deeply upon the well established principles of the common law ; to change so essentially its wise provisions ; and that this result was to be accomplished by a remote and questionable implication?

The Supreme Court of Pennsylvania has decided that this power of removal, as incident to that of appointment, has never in this country been held to exist beyond the executive department; and does not extend to officers concerned in the administration of justice. 5 Rawle, 203.

It must be apparent, then, that the Court is not called upon to unsettle or disregard the constitutional doctrines adjudged by the legislature in 1789. The counsel for the relator have no such wish or design. Independently of the weight of authority which sanctioned that decision, we are free to confess, that were the question now an open one, we should fully concur in the decision then made. We cannot believe that the government could exist a twelvemonth under a different rule.

Unless, then, we can satisfy the Court that the decision then made leaves this case wholly unaffected, we bow to that authority. But in our judgment, the argument of Mr. Madison is conclusive ; and there is every reason to believe, as well from tradition as from the report of the debate itself, that that argument was mainly instrumental in bringing about the result. Mr. Madison did not rest his argument principally upon the ground that the power to remove was an incident of the power to appoint. He proceeded upon the principle that the relation of principal and agent existed between the President and the secretary. That such a power was essential to enable the former to perform his own constitutional duties. That he was responsible to the country for the acts of his agents. That no other power existed which could guard against the mischiefs and dangers that might threaten the nation, if one of these high functionaries should become faithless or incompetent.

That argument leaves this question untouched. The clerk is not in any sense the agent of the Court. The doctrine of responsibility does not exist. The clerk may be controlled by the judicial power of the Court. He may be adjudged, on familiar principles of the common law, to forfeit his office, by breach of the condition annexed

[Ex parte Duncan N. Hennen.]

to it; by misfeasance or nonfeasance. 1 Hawk. 412. He may be punished by process of attachment, for a contempt in not obeying the lawful orders of the Court, even under the mitigated law, as it exists since the act of March, 1831. 8 Laws U. S. 488.

The possession of this ample judicial control excludes the idea that the judge by virtue of the power of appointment, a power ministerial and not judicial, can remove the clerk at his own will and pleasure. He can oust him from office for good cause; there is therefore no room for implying a power to remove him without cause. He may eject an officer who is incompetent, who neglects to perform his duties, or who abuses the trust reposed in him; this takes away the necessity for vesting in him, by implication, a power of removal: which if exercised under any other circumstances, or in any other cases, must involve, as in this case, a flagrant breach of public duty, and a flagrant abuse of power. Powers are only implied from necessity. If no cogent reason exists why that which is not in express terms granted, should yet pass by implication, such a construction is not to be favoured.

It has been shown that this authority is not conferred upon the judge in any larger grant, or as a necessary means to perform his own positive duties, as in the case of the President: that it does not grow out of the relation of principal and agent, as in that case—and that, without invoking the aid of this strained construction, the superintending power of the Court, acting within its appropriating sphere, and in conformity with its ordinary rules, is ample for every lawful or useful purpose : that such a construction is not in analogy to the principles of our institutions ;—that it is at variance with the wise and liberal principles of English law, and contrary to the avowed doctrine of those who drafted the statute under which the power is claimed. Upon all these grounds, separately so strong, and in their joint authority so conclusive, it is submitted that the first point in the argument is established—that as a ministerial power, growing out of the authority to appoint, it does not belong to the district judge.

2. The second point contended for on behalf of the relator is, that admitting the power of removal to reside in the district judge, yet the act of removal of Mr. Hennen was not a legal exercise of a legal authority, but a palpable and gross abuse : that such abuse is per se illegal and cannot operate to deprive the relator of his office, or to confer the rights of office upon Mr. Winthrop.

In general, the motives which stimulate men to act, excepting so far as they are apparent in the act itself, are inscrutable to human ken. The motive is sometimes however worse than the mere act itself would indicate, as in the celebrated case decided under the Coventry act; in which one brother, indicted for an assault upon another with intent to maim and disfigure, had the audacity to defend himself upon the ground that his intention was to kill.

In the present case, the learned judge, with more frankness than prudence, in the very act of dismissing the relator, bestows upon him the highest eulogium, declares him methodical, prompt, skilful and

upright, in the discharge of his duties, and assigns as the motive of his conduct the paramount claims of personal friendship. The question then is distinctly presented, whether, when such objects and such motives are avowed, the act can be deemed a legal and constitutional exercise of power; or whether it be not a gross and flagrant abuse which invalidates the act.

Such a proceeding as that presented by the record, is a clear violation, by the judge, of his oath of office. He is required by law to take an oath that he will "faithfully and impartially discharge and fulfil all the duties incumbent upon him as district judge, according to the best of his abilities and understanding," 2 Laws U. S. 59, sec. 8. The phraseology of this oath marks clearly the manner in which he is to execute all the powers confided to him officially.

Here again we may advert with advantage to the debate in the House of Representatives in 1789. Mr. Lawrence; 1 Gales and Seaton's Debates, 504, in an early stage of the debate remarked: " If the President abuses his trust, will he escape the popular censure ? And would he not be liable to impeachment for displacing a worthy and able man, who enjoyed the confidence of the people." Mr. Madison, p. 517, observed : " The danger then consists merely in this, that the President can displace from office a man whose merits require that he should be continued in it. What will be the motive which the President can feel for such abuse of his power, and the restraints that operate to prevent it ? In the first place he will be impeachable by the House, for such an act of mal-administration ; for I contend that the wanton removal of meritorious officers would subject him to impeachment and removal from his own high trust." Mr. Vining, p. 531, remarked that, " if the President removes a valuable officer, which seems to be the great danger the gentleman from South Carolina apprehends, it would be an act of tyranny which the good sense of the nation would never forget." And Mr. Baldwin, p. 580, pronounces such an act, " an abuse of power." Not one gentleman who participated in the debate dissented from these views.

We hold this to be the sound constitutional doctrine. It is a vital principle of our institutions. To assert the contrary, is to confound power with right, and involves the absurdity of making every exercise of power a rightful and lawful exercise.

The President has the power to interpose his veto upon any act of Congress : were he, in the exercise of this high function, to avow his conviction that the law submitted to him was just and proper, demanded by the wants of the community and the voice of the nation, and that no constitutional objection could be urged against it, but that under the impression it might materially affect the interests of individuals, towards whom he cherished feelings of affection, he had recognised the paramount claims of private friendship, and vetoed the bill: who could doubt that he had violated his high trust, grossly abused the power reposed in him, and merited the severest punishment the violated laws of his country could inflict ?

Did a judge assert the same paramount influence as furnishing

him with a motive to award judgment against a party whose legal rights he at the same time recognised; can a doubt exist that he would meet with the appropriate recompense?.

This principle extends throughout the entire sphere of official duty; it is applied by Courts in the administration of private justice. In M'Queen vs. Farquhar, Lord Eldon observes, "it is truly said this Court will not permit a party to execute a power for his own benefit. In Lord Sandwich's case, a father, having the power of appointment, and thinking one of his children was in a consumption, appointed in favour of that child; and the Court was of opinion that the purpose was to take the chance of getting the money as administrator of that child."

If such an act would invalidate the exercise of a power involving the pecuniary interests of a citizen, must it not work the same result, when an individual abuses a public trust confided to his hands from considerations of the general good? Can there result any injury or wrong from carrying out, in every case, the pure principles of private morality and fidelity in the discharge of a trust?

This doctrine has long been engrafted into the English law. Lord Coke in his first Institute, (1 Thom. Coke on Litt. 239, 240,) says: "there be at this day more conditions in law annexed to offices than there were when Littleton wrote; for example, for offices in any way touching the administration of justice, or clerkship in any Court of record," &c. "For if any of these officers bargain or sell any of their offices, or any deputation of the same," &c., "he shall not only forfeit his estate, but be adjudged a disabled person to have or enjoy the same office," &c. "Therefore," he concludes the subject, "by the law of England it is further provided, that no officer or minister of the king shall be ordained or made for any gift or brokage, favour or affection, nor that any which pursueth by him or any other, privily or openly to be in any manner of office, shall be put in the same office or any other; but that all such officers shall be made of the best and most lawful men and sufficient: a law worthy to be written in letters of gold, but more worthy to be put in due execution. For certainly never shall justice be duly administered, but where the officers and ministers of justice be of such quality, and come to their offices in such manner as by this law is required."

The act then does not depend exclusively for its legality merely upon the fact that it is within the power which the party possesses. An abuse of a legal authority is illegal, an abuse of constitutional power a high misdemeanour. In the opinion of some of the most eminent men our country has produced, the very act which is the subject of our present consideration constitutes an impeachable offence. That conduct which is impeachable, cannot be legal. An illegal exercise of a power is a nullity, and void.

Nor does this doctrine rest merely upon these authorities, venerable and respectable as they are. Chancellor Kent, (1 Kent's Com. 288, 289,) recognises the doctrine that for an abuse of the executive trust, the President is impeachable, and he considers it as an abuse of his

authority to violate the Constitution or law of the land. Judge Story, (Com. on Const. sec. 788,) speaking of the President, says, "if he ventures upon a system of favouritism he will not escape censure, and can scarcely avoid public detection and disgrace." Sec. 789. "It should never be forgotten that in a republican government offices are established and are to be filled, not to gratify private interests and private attachments; not as a means of corrupt influence or individual profit; but for purposes of the highest public good." In sec. 792, we are told, that "it is the duty of the President," among other things "to disregard the importunities of friends; the hints or menaces of enemies; the bias of party, and the hope of popularity." Sec. 794. The Courts of the Union possess the narrow prerogative of appointing their own clerk, and reporter, without further patronage. No intimation is given of the power to remove at pleasure. In contrast with this narrow prerogative, this distinguished judge contrasts the exorbitant power, grown up from a small "seminal principle" of the postmaster general; of which he says, "the great anomaly in the system is the enormous patronage of the postmaster general, who is invested with the sole and exclusive authority to appoint and remove all deputy postmasters." Finally, in sec. 798, he adopts to the fullest extent, the opinions of Madison and others as pronounced in 1789; and declares, that "removals from office with a view to bestow the office upon a dependant or favourite is an impeachable offence."

Fortified in our positions by this array of authority, we have felt no hesitation in asserting that the act of removal attempted to be exercised in this case, is a clear abuse of power, if the authority indeed exists; is a palpable violation of duty, and subjects the offending party to impeachment, as for a high misdemeanour. If such be the character of the act, it is in vain to contend that it can be valid.

3. Is the remedy by mandamus the appropriate legal remedy?

In White's case, (6 Mod. 18,) an application was made for a mandamus, to restore the party to the place of clerk of the company of butchers, and the case of an attorney of an inferior Court was cited, in which the mandamus had been issued, but Holt, Chief Justice, said that case differs. 1. Office of attorney concerns the public, for it is for administration of justice. 2. He has no other remedy. The case thus recognised bears a strong and complete analogy to that at bar. The office of clerk nearly concerns the administration of justice, and the party has no other remedy. If any writ of quo warranto would lie in Louisiana, it must be brought in the same Court before the same judge who has committed the wrong in the original case. An assize is equally out of the question, and is not only obsolete in England, but utterly impracticable here. Mandamus was awarded to restore one to the office of steward of a Court Leet, but from which he had been displaced for his affection to the king. T. Ray. 18. On motion for a mandamus to restore an attorney, the Court was at first equally divided; T. Ray. 57; but it was subsequently allowed; ibid. 94. In Dighton's case, T. Ray. 188; 1 Vent. 77; a mandamus

was prayed to restore a town clerk, but refused: because by the terms of the charter, the town possesses the absolute power of turning him out. This, however, was thought so monstrous a grievance, that the Court advised to have the patent repealed. In Dew *vs.* The Judges of the Sweetspring District Court, 3 Hen. and Munf. 1; mandamus was held, after full argument, to be the appropriate remedy to restore a clerk who had been superseded by an irregular appointment. In 3 Devereaux the same point was solemnly adjudged.

If the remedy be appropriate, this is the only tribunal by which it can be awarded. By the provisions of the judicial act, the clerk of the District Court becomes the clerk of the Circuit Court. The record shows that the associate judge of this Court who presides in the Louisiana Circuit Court, refused to recognise the validity of the act of the district judge, or to receive the clerk whom he had attempted to appoint. In consequence of the disagreement of the two judges, there is no clerk. No business is or has been transacted in the Circuit Court; the government and individual suitors are unable to proceed in their causes; no case can be brought up to this tribunal, and the whole appellate jurisdiction of this Court is suspended during this extraordinary state of affairs. Unless this Court interpose, such a state of things must remain; a mandamus is prayed to both Courts, and we consider each as a necessary exercise of the appellate power of this tribunal, and in accordance with the former practice of this Court. Ex parte Burr, 9 Wheat. 529; Ex parte Crane, 5 Peters, 190.

Mr. Gilpin opposed the rule to show cause.

This rule ought not to be granted:

1. Because the petitioner is not entitled to the office.

2. Because, if he is entitled to it, a mandamus commanding the judges of the District and Circuit Courts of Louisiana to restore him to it, is not the proper mode of ascertaining his right.

3. Because, if he is entitled to it, and if a mandamus is a proper remedy; yet this Court, under the limitation of its powers by the Constitution and laws, has no authority to issue that writ in such a case and for such a purpose.

I. The office of clerk of a District Court of the United States, is a public office created by law for a public benefit; its duties are defined by law; and the mode in which the incumbent is to be appointed, is expressly designated by law. It does not depend on usage or custom. The Constitution requires (art. 2. sect. 2.) the mode of appointment to inferior offices to be designated by law.

By the third section of the act of the 24th September, 1789, (1 Story's Laws, 54,) there is to be a District Court of the United States in each district, the judge of which is to be called the District Judge. By the seventh section of the same law (1 Story's Laws, 56,) the District Courts are to appoint clerks for their respective Courts; the clerk for each District Court is to be clerk of the

Circuit Court in the same district; and the clerk is to take oath and give bond before he enters on his office. By the eighth section of the act of 26th March, 1804, (2 Story's Laws, 936,) a District Court was established in the territory of Orleans, to consist of one judge, "who shall appoint a clerk." By the third section of the act of 8th April, 1812, (2 Story's Laws, 1225,) the state of Louisiana was formed into a district, and a District Court established there, the judge of which "shall appoint a clerk." By the act of 3d March, 1823, (3 Story's Laws, 1920,) Louisiana was divided into an eastern and western district, with a District Court for each; though the same person was to be judge of both. By the act of 3d March, 1837, (4 Story's Laws, —,) the eastern district of Louisiana is made part of the ninth circuit; and it is provided that "the Circuit Court, and the judges thereof, and the District Court, and the judges thereof, are to have like powers as in other circuits and districts."

In the year 1837, Judg Lawrence was duly appointed and commissioned as district judge for the eastern district of Louisiana. On the 18th May, 1838, he did, as district judge, appoint John Winthrop clerk of the District Court for that district, by a commission under his hand. On the 19th May, 1838, Mr. Winthrop took the oath and gave the bond required by law, and entered upon the duties of the office.

Thus, according to all the provisions of law, Mr. Winthrop is now clerk of the District Court; and under the seventh section of the act of 24th September, 1789, is also, ipso facto, clerk of the Circuit Court in the same district.

On what ground, then, does the petitioner claim this office? It is this, that on 21st February, 1834, Judge Harper, at that time district judge, appointed the petitioner clerk of the Court. Now, as it is admitted that no person but a district judge can appoint a clerk of the District Court, and as the appointment made by the present judge is asserted to be illegal; the conclusion must be that the appointment of a clerk once made cannot be revoked or superseded by the Court making it. This is the only ground on which the petitioner can sustain his right to this office.

This position is denied, because the express words of the law vest in the District Court the power of appointing a clerk at any time; because this appointment is similar in character to others which are unquestionably superseded by new appointments; and because every ministerial or executive office, is, ipso facto, terminated by a new appointment legally made of a competent officer; unless otherwise provided by express law.

1. By the words of the several acts of Congress, this power of appointment is vested in the Court, and the judge for the time being. There is no restriction or limitation to it. It is neither greater nor less than other powers vested in the Court or the judge. He "has power" to appoint a clerk, as he "has power" by the words of the law to order books to be produced, to grant new trials, to punish contempts, or to make rules and regulations. Cannot acts done by

virtue of those powers be revoked or superseded by a new exercise of the same power? That will not be denied. These powers are discretionary; to be exercised by the Court and the judge, according to such discretion, at any time; and they may, therefore, be so exercised, even though they should operate to revoke or supersede previous acts. There is nothing which limits or restricts the present judge, because a former one has acted under the same power.

2. Nor is there any thing in the nature or character of this power of appointing a clerk, as vested by law in the district judge, which makes it different from the appointing power vested in other persons; and in whose case, it is not denied that its exercise supersedes a previous appointment. The acts of 1804, 1812, and 1823, which authorize the district judge to appoint a clerk, also authorize the President to appoint an attorney and a marshal. It will not be contended that the latter are irrevocable; yet there is no distinction whatever in the grant of power. An appointment of an attorney by a former President, does not take from the present executive the power to appoint a new one: why then should the act of a former judge restrict the actual incumbent? Either both are perpetual, or both may be superseded. In an act passed on the 3d March, 1831, (4 Story's Laws, —,) the district judge of Louisiana is "authorized to appoint an interpreter to the District Court." It will hardly be contended that such an appointment cannot be superseded by the Court; yet the power given in that case is no broader than in regard to a clerk.

3. There is nothing in the act of Congress, conferring this power of appointment, which in terms, forbids its termination within a limited time: and it is a settled principle, arising out of the Constitution and laws of the United States, that unless there be such a prohibition, every ministerial or executive office is, ipso facto, terminated by a new appointment legally made. The Constitution prescribes the several modes by which appointments to all offices are to be made; these are by elections, by the President and Senate, by the President, by the Courts of justice, and by the heads of departments. It also designates out of all officers whose appointment is thus provided for, but five classes whose terms shall be of a certain duration, which cannot be lessened unless by the death, voluntary resignation, or impeachment of the incumbents. These are representatives in Congress, who shall hold their office for a term of two years; the President and Vice-President for four; the senators for six; and the Judges "during good behaviour." The irresistible inference from this is, that by designating certain officers of whose terms it absolutely fixes the duration, it meant to lay down no such rule in regard to any others.

An ambassador to a foreign government, or a secretary of one of the executive departments, holds his office under the same general power of appointment, when vested in the President, as a clerk of Court does when it is vested in the Court. The Constitution has not

x 2

made the term of one more nor less independent of the appointing power than the other. It has annexed to the power of appointment the same rights in one case as in the other. More properly speaking, it annexes the same duties. The power of appointment is a trust to be exercised for the public welfare; it is the duty of the appointing power to select at any time the person best qualified to fill the office; he has no right to avoid its exercise, if he believes it to be essential to the general good. The fitness of the officer may depend on other circumstances than his own merits, as is strikingly the case with ambassadors or foreign diplomatic agents; with whom it may often happen that at particular conjunctures, public expediency may require the selection of one man in preference to another, without contrasting their individual merits. The appointing power is bound to act upon these causes, so as justly to perform his trust. If in so doing, he supersedes a previous appointment, or removes a previous incumbent, that is an unavoidable result; but it would afford no excuse for the neglect of a high trust.

Nor does this view of the constitutional duty of the appointing power go to pardon or excuse any impropriety in its exercise. On the contrary, by imposing the duty of selecting the proper person at every time, it places the performance of that duty under more strict supervision. Wrongfully, or corruptly, or improperly to exercise it, becomes, in this light, an official misdemeanor. Unquestionably, a judge who should be governed by favouritism or corrupt motives in performing one branch of his constitutional functions, would be equally amenable to the laws as if he were so in discharging another. His responsibility is the same whether he exercises the power to appoint an officer, or the power to punish a contempt; to grant a new trial; or to do any other act which under the laws he "has power" to do. Misdemeanor in one case would afford as good ground for impeachment as in the other.

If these positions be true, it then follows that, under a fair construction of the Constitution, the appointing power, when not limited, is to perform its duties at the time and manner deemed best for the public good; but strictly responsible to the highest tribunal for an honest discharge of those duties; and strictly responsible also, to private individuals, for so using it, as not to interfere with their legal rights.

And such has been the uninterrupted practice under the Constitution for fifty years. Has it ever been doubted, that the President may recall an ambassador when he chooses, or change the heads of departments? Is it denied, that the heads of departments may remove or supersede the clerks in their respective offices? By what reasoning, then, could a different practice be sustained in regard to the Courts of law; when the Constitution confers in the same sentence, the same powers upon them as upon the President and the heads of departments?

So generally has this principle been admitted, and so uniform has the practice been, that out of the innumerable cases in which public

officers have been superseded or removed by a new exercise of the appointing power, very few have become subjects of judicial examination. Whenever they have been so, this exercise of the appointing power has been judicially recognised. In the case of the Commonwealth vs. Sutherland, 3 Serg. and Rawle, 148; and in that of the Commonwealth vs. Bussier, 4 Serg. and Rawle, 451; the Supreme Court of Pennsylvania decided that the general power of appointment, vested in the governor, authorized him to remove an incumbent wherever the time for the continuance of the office was not fixed. In the case of Bowerbank vs. Morris, Wallace, 119, it is held, that such removal may be made either by express notification, or simply by appointing another person to the same office. The case of Avery vs. the inhabitants of Tyringham, 3 Mass. 160, cited to sustain a different doctrine, arose out of the long established usage in New England, which regards the relation between the minister and parish in the light of a contract, to be limited by express agreement, or if not, only to be dissolved for some good cause, or by consent of both parties. Even at common law, a custom for the appointing power to remove ad libitum, where the term was not fixed, or the incumbent held at will, was always held to be a good custom. Rex vs. Mayor of Coventry, 2 Salkeld, 130. Rex vs. Wardens of Thame, 1 Strange, 115. Rex vs. Mayor of Cambridge, 2 Shower, 70.

If a full expression of the legislature of the Union, on this important part of the American Constitution, is to be regarded by Courts of justice as an authority, we have that also deliberately given, fully sustaining the right of the appointing power to remove, where no express provision exists; and declaring that right to be incidental to the power of appointment. The debate in the House of Representatives, on the bill "to establish the department of foreign affairs," and the vote on 22d June, 1789, (Journal of Congress, vol. i. p. 50;) have always been regarded as conclusive in regard to the opinions of those who framed the Constitution.

The result then is, that Mr. Winthrop being duly appointed, the petitioner is superseded and removed. He has, therefore, no legal right to the office to which he asks to be restored.

II. But if he has a right to the office, a mandamus is not the proper mode of ascertaining it. This is not a case for a mandamus, according to the principles and usages of law.

1. A mandamus can only be issued to a person or inferior tribunal, which the Court issuing it has a right to control, in the particular instance. It is a high prerogative writ. It is an order from a superior to an inferior tribunal, when the inferior neglects a duty which the superior is bound to see performed. It is never granted against a judge of the Court that issues it; as would be the case here, were this rule allowed against the judge of the Circuit Court of Louisiana. It is never granted against a judge of the higher Courts of common law. In the case of Audley vs. Joyce, Popham, 176, it is spoken of as a flower of prerogative, vested in the King's Bench, to be

used in controlling municipal corporations. In Rex *vs.* Baker, 3 Burr. 1265. 1267, it is said, that it is to be exercised only when absolutely necessary; and then in virtue of a general supervising power. In the Rioters' case, 1 Vernon, 175, and again in Lawlor *vs.* Murray, 1 Sch. and Lefroy, 75. 79, the Court of Chancery declared they would not presume to issue it to the Chief Justice of the King's Bench. In Bridgman *vs.* Holt, Show. Parl. Ca. 117, the judges of the King's Bench remonstrated against a mandatory process from the House of Lords, as trenching upon their rights; since it was compelling the action of those who by the law of the land had a right to exercise their own judgment. In some instances it has been issued by a higher Court of record to an inferior one, directing it to perform some strictly ministerial act; but even these instances are few in number: and its exercise in common law cases is found to be chiefly confined to municipal corporations, Courts of sessions, and such tribunals. Brooks *vs.* Ewers, 1 Strange, 113. Ex parte Amherst, T. Ray. 214. Ex parte Morgan, 2 Chitty, 250.

In Pennsylvania, the Supreme Court, which is one of general appellate jurisdiction, has refused to say whether it will in any case issue a mandamus to a Court of Common Pleas. Commonwealth *vs.* Court of Com. Pleas, 3 Binney, 273. Commonwealth *vs.* Court of Com. Pleas, 1 Serg. and Rawle, 195. Morris *vs.* Buckley, 8 Serg. and Rawle, 211.

In New York, the Supreme Court has indeed assumed a general supervisory power over other Courts, similar to that of the King's Bench in England; but even they have seldom, if ever, exercised this power of mandamus, except in cases of clear ministerial duty, and chiefly against town officers, &c. Sikes *vs.* Ransom, 6 Johns. Rep. 279.

Upon these principles, this is no case for a mandamus. There is neither the high superiority in the one tribunal, nor inferiority in the other; nor the evident right of control in the particular case, which is necessary to justify it. There is no precedent for it in the judicial decisions of Courts in England, or any of the states; and, as was said by the Court of King's Bench, in Rex *vs.* Newcastle, 3 Barn. and Adolph. 252, it ought to be refused, where there is no precedent for the exercise of such a power.

2. A mandamus can only be issued to a person, or inferior tribunal, when the act ordered to be done is ministerial, not discretionary.

In Foot *vs.* Brown, 1 Strange, 625, the Court of King's Bench refused a mandamus to compel a corporation to proceed to an election, because it was discretionary with the corporation. In Giles's case, 2 Strange, 881, they said, that where justices of sessions had a discretionary power, a mandamus would not be granted. In Rex *vs.* Gray's Inn, 1 Douglas, 353, a mandamus to compel the benchers to admit a barrister was refused. In Rex *vs.* Exeter, 2 East, 462, a mandamus to compel the archbishop to admit an advocate of the Archer's Court was refused. In Rex *vs.* Gloster, 2 Barn. and Adolph. 163, where the bishop refused to confirm a deputy registrar, who

then applied for a mandamus, the Court of King's Bench said, "there was no mode of forcing a person, who has a discretionary power, to exercise it;" and they added, "Suppose the bishop returned reasons which we thought insufficient, what course could we take." And the cases of Rex vs. Flockwood, 2 Chitty, 251; Ex parte Morgan, 2 Chitty, 250, and Rex vs. Wilts, 2 Chitty, 257, all show that the Court of King's Bench will never control inferior Courts in matters of judgment.

The Supreme Court of New York, in Wilson vs. Albany, 12 Johns. Rep. 414, said that, "wherever a discretionary power was vested in an officer, and he had exercised that discretion, they would not interfere; because they could not control, and ought not to coerce, that discretion." In Gilbert's case, 3 Cowen, 59, the same Court refused a mandamus to require the Court of Common Pleas to strike out certain conditions which it had thought proper to annex to one of its orders. In ex parte Johnson, 3 Cowen, 371, the same Court refused to compel the Court of Common Pleas to hear charges against a justice of the peace.

The Supreme Court of Pennsylvania, in Commonwealth vs. Common Pleas, 3 Binn. 273, said that, "they could not compel an inferior Court to decide according to the dictates of any judgment but its own. In Commonwealth vs. Cochran, 5 Binn. 103, they said they could only direct an inferior Court to act according to the best of its judgment. In Commonwealth vs. County Commissioners, 5 Binn. 536, they refused to direct the commissioners to allow an account. In Commonwealth vs. Clarkson, 1 Yeates, 48, they refused to direct the commissioners of bankruptcy to give the bankrupt a certificate, although they thought him entitled to it. In Commonwealth vs. Common Pleas, 1 Serg. and Rawle, 187, they refused a mandamus to compel the Common Pleas to admit an attorney. And in Austin's case, 5 Rawle, 203, where a Court of Common Pleas had struck several attorneys from the rolls, it was necessary to obtain an act of assembly to give the Supreme Court jurisdiction over the case.

The Supreme Court of Virginia do not establish a different principle in Dew vs. The Sweetspring's Court, 3 Hen. and Mun. 1, cited by the opposite counsel; for there the appointment of the clerk did not belong at all to the inferior Court. The appointment was vested entirely in the superior Court; and all the inferior Court had to do, was to take the security—a duty clearly ministerial.

In Louisiana there are eight District Courts, from which there is an appeal to the Supreme Court. The District Courts appoint their own clerks; and the Supreme Court "has power" to issue all mandates necessary for the exercise of its jurisdiction over inferior tribunals. 1 Digest of Louis. Laws, 295. In the case of Winn vs. Scott, 2 Louis. Rep. 89, the Supreme Court said they could not issue a mandamus except to aid their appellate jurisdiction. In Louis. College vs. State Treasurer, 2 Louis. Rep. 395, they refused to direct a public officer to do an act relative to which he was invested with discre-

tionary power. In State *vs.* Dunlap, 5 Martin, 271, they refused to direct a district judge, by mandamus, to restore to office a clerk of the District Court whom he had removed, though they disapproved of the removal.

The Supreme Court of the United States, in U. S. *vs.* Lawrence, 3 Dall. 45, said they would not compel a district judge to decide according to any judgment but his own. In Marbury *vs.* Madison, 1 Cranch, 171, they said that where an officer was to exercise executive discretion, any application to control his conduct would be rejected without hesitation. In M'Cluney *vs.* Silliman, 6 Wheaton, 598, they refused to interfere with a register of a land office acting within the limits of his office.

The principle, therefore, is settled beyond question, that where the inferior tribunal has a discretion, and is to exercise its judgment in the act to be done, there a mandamus cannot be issued. In the present case the duty is clearly discretionary : it is one requiring the exercise of judgment: it is in no sense ministerial: it is either judicial, if regarded as an act of the Court; or it is executive, if considered as the act of an officer, vested by the constitution and law with the power of appointment.

3. A mandamus cannot be issued to restore a person to an office which is not a permanent one—never to an office determinable at pleasure. In Draper *vs.* Blaney, 1 Levinz. 291; Peppis's case, Vent. 342; and Dighton's case, Vent. 82; a mandamus was refused to restore a town clerk who had been removed—the corporation being vested with the power to appoint, without any limitation as to the tenure of the office.

4. A mandamus cannot be issued unless the petitioner has no other legal remedy.

In Rex *vs.* Street, 8 Mod. 98, the Court of King's Bench refused a mandamus, to direct the old churchwardens to deliver up the parish books to their successors; because the latter might try their right to them at law on a feigned issue. In Rex *vs.* Chester, 1 Maule and Sel. 103, the same Court said they would not grant a mandamus, where another remedy was open to the parties. In Marbury *vs.* Madison, 1 Cranch, 169, this Court said, that a party applying for a mandamus must be without any legal remedy.

In this case the petitioner can try his right, either by an information in the nature of a quo warranto; or by an action for money had and received; or by assize.

In the case of the People *vs.* New York, 3 Johns. Cases, 79, it is held, that a mandamus is not to be granted to admit a person to office, where another is in by colour of right. The proper remedy, say the Court, is by an information in the nature of a quo warranto.

In Rex *vs.* Jotham, 3 Term Rep. 575, it was held, that a mandamus was not to be granted even to restore to office a person previously admitted; because he could try his right by an action for money had and received. And the cases of Harcourt *vs.* Fox, 1 Shower, 516; Smyth *vs.* Latham, 9 Brigham, 692; and Avery *vs.* Tyringham, 3

Mass. Rep. 160, all show that an action of assumpsit for the fees or salary of an office, is the proper mode of ascertaining the right of the party claiming it.

The action of assize, though out of use, is in all respects consistent with our general practice of introducing (somewhat simplified in form) the direct modes of action established by the common law. It allows to both parties a trial by jury; gives damages to the injured party; and restores him to the office if unjustly deprived of it. The Supreme Court of New Jersey, in Farley vs. Craig, 3 Green, 218, recognise it as the proper mode " to recover seisin of an incorporeal hereditament, and damages for its deprivation." It is invariably so recognised by the Courts of common law in England. In Webb's case, 8 Coke, 47, it is held, that a man may have an assize of an office, ut de libero tenemento, at common law. In Vaux vs. Jefferen, 2 Dyer, 114, an assize lies to recover the office of philizer in the Court of Common Pleas. In Coveney's case, 2 Dyer, 209, the prerogative writ was refused, to restore the president of a college to his office, because he could have assize at common law. In Rex vs. Westminster, Comb. 244, a mandamus to admit a bailiff was refused, because he could have assize. In an anonymous case, 6 Mod. 18, Holt said, that a mandamus ought not to go where a party could have assize; and in Rex vs. Baker, 3 Burr. 1268, the same point was ruled. In Bridgman vs. Holt, Show. Par. Cases, 111, we have a direct case in point, of an assize brought by a person claiming to be lawfully clerk of the Court.

It is therefore submitted, that, whatever may be the legal right of the petitioner to the office he claims, this is not a case in which a mandamus would be granted according to the principles and usages of law; because this Court has not such a control over the inferior Court as to warrant it; because the act complained of was not ministerial but discretionary; because the office in question is not a permanent one, to endure for a definite period; and because the party complaining has other and more appropriate remedies if he has been unjustly removed.

III. But if the case were one in which a Court, vested with unlimited power, would interfere by mandamus; still this Court, deriving their authority from the express grant of the Constitution and the laws founded on it, cannot issue it in such a case.

1. This Court has no power to issue a mandamus to restore a clerk of the Circuit or District Cour., by virtue of its original jurisdiction. That jurisdiction is limited by the Constitution to cases affecting "ambassadors," "public ministers," and "consuls," and those "wherein a state is party." This case is neither of these. It is true, the 13th section of the act of 24th September, 1789, 1 Story's Laws, 59, did give this Court power " to issue writs of mandamus in cases warranted by the principles and usages of law;" but that enactment was solemnly decided in Marbury vs. Madison, 1 Cranch, 176, and in Ex parte Crane, 5 Peters, 193, to be contrary to the Constitution, as an exercise of original jurisdiction.

2. Nor can it be exercised by virtue of its appellate jurisdiction; for the restoration of a clerk to office is in no sense an appellate proceeding. It is held, in Marbury vs. Madison, 1 Cranch, 175, that an appeal is a resort to this Court "to revise and correct the proceedings of the Court below in a cause already instituted." In Wishart vs. Dauchy, 7 Cranch, 110, it is said there are two modes of doing this—a writ of error in common law cases, to re-examine the decision in point of law; and an appeal in civil law cases, to review the law and fact. In Davis vs. Braden, 10 Peters, 287, it was held, that in order to bring up a division of opinion between the judges of a Circuit Court before this Court, the point on which they divided must have "arisen on the trial of the case below." The judiciary act, 1 Story's Laws, 60, establishes the same rule: it confines the appellate jurisdiction of this Court to appeals and writs of error; and says, too, that these must be from final decrees and judgments. In the present case, there is no cause instituted of which the proceedings are to be revised and corrected; no decision on a point of law to be re-examined; no law and fact to be reviewed; no division of opinion on the trial of a cause below; no appeal or writ of error from a final decree or judgment. How then can this case come within the appellate jurisdiction of the Court?

3. Nor is it in any respect necessary to the exercise of the appellate power of this Court, that the petitioner should be restored to the office of clerk. There is no writ of error or appeal waiting below for the want of this officer. There is no allegation that the restoration of the petitioner is required for any such cause. There is a clerk doing all the business. The mandamus is not sought for on this ground; but avowedly for the purpose of trying, in this mode, the title to the office. This Court has, in numerous cases, decided where a mandamus is or is not necessary to the execution of its appellate powers; in no one of them has it been held to be necessary in such a case as this. Out of the seventeen applications made to this Court since its establishment, to issue writs of mandamus, but four have been granted. The decision of the Court in these four cases of United States vs. Olmstead, 5 Cranch, 115. Livingston vs. Dorgenois, 7 Cranch, 577. Ex parte Bradstreet, 7 Peters, 634; and New York Insurance Company vs. Wilson, 8 Peters, 291; after elaborate argument, was, that the Supreme Court would issue a mandamus to a district judge, directing him—1. To execute a decree of his Court in an admiralty case, where execution had been delayed on account of the extraneous interposition of a state law. 2. To proceed to a final judgment, and not stay proceedings indefinitely. 3. To reinstate a suit dismissed on motion, after issue joined, so that the parties might have a final judgment. 4. To sign a judgment on the record where it had been previously recovered and recovered and entered according to the law. The principle established by these decisions is, that there must be a suit pending in a Court below, and that the act which the inferior Court is required to perform

must be ministerial in its character, and necessary to the final termination of the cause in that tribunal.

The thirteen cases in which this Court refused applications for mandamus, are, United States *vs.* Lawrence, 3 Dall. 42. Marbury *vs.* Madison, 1 Cranch, 137. M'Cluney *vs.* Silliman, 2 Wheat. 369. Ex parte Burr, 9 Wheat. 529. Bank of Columbia *vs.* Sweney, 1 Peters, 567. Ex parte Crane, 5 Peters, 190. Ex parte Roberts, 6 Peters, 216. Ex parte Davenport, 6 Peters, 661. Ex parte Bradstreet, 8 Peters, 588. New York Insurance Company *vs.* Adams, 9 Peters, 573. Postmaster General *vs.* Trigg, 11 Peters, 173. Ex parte Story, 12 Peters, 339. Poultney *vs.* Lafayette, 12 Peters, 472. The principles established in these cases in regard to this writ, are these: the Supreme Court will never compel an inferior Court, in which a suit is pending, to do any act relating either to the practice of the Court, or the merits of the case, in regard to which act the inferior Court is vested with a judicial discretion; even if they are of opinion that the Court erred in the exercise of their discretion. Nor will the Supreme Court interfere with an inferior Court in the suspension of its attorneys. Nor will it control an executive officer in the discharge of an executive function, unconnected with a pending suit; even if they are of opinion that it was improperly exercised.

If the rules thus laid down by the solemn decisions of fifty years, both for allowing and refusing writs of mandamus by this Court, be applied to the present case; it will be evident that the application of the petitioner cannot be granted. It has solemnly decided when this process is, and when it is not necessary to aid the appellate jurisdiction of the Court: and these decisions absolutely exclude a case like that now presented.

Whatever, therefore, may be the legal rights of the petitioner, or however proper a proceeding by mandamus might be, in a Court less limited in its duties and constitutional functions, it is submitted that there is nothing in the laws of the land, or in the established practice of the Supreme Court of the United States, which will warrant it in compelling a circuit or district judge, by mandatory process, to appoint a particular individual as clerk of his Court, or to restore him to that office after he has been superseded or removed.

Mr. Jones, also against the motion, presented the case to the Court on the abstract, legal power of the district judge to remove from office a clerk who was the incumbent, and to appoint another person.

The right to remove is an incident to the power of appointment. It is essential to the exercise of the power to appoint; and the power which is given by the law cannot exist without this incident.

If the common law has any bearing on this question, it is very remote. The Constitution of the United States, and the laws made in conformity with the provisions of the Constitution, are es-

sentially different from the common law, as to appointments to offices, and as to the tenure by which they are held. 2 Black. Commentaries, 36, 37. The law of the tenure of office in England, is regulated, not by any principles of ethics, or express provision, but by immemorial usage. Office is there an incorporeal hereditament, as a right of way. There is, under the common law, an estate in an office.

But in the United States this is not so. There is in this country no estate in any office. No property in an office. Offices are held for the benefit of the community, in which their functions are exercised. As to the tenure and nature of office in England: cited Coke Litt. 378ᵃ. 4 Institute, 117. Coke Litt. 233ᵇ. 2 Institute, 388.

The position in England is, that unless the statute which creates the office limits its tenure, at the time of the creation; it is an office for life, as at the common law. But here no such principles prevail. The common law does not apply to offices, which are all created by the Constitution, or by express statute.

It is contended by the counsel for the relator, that the power of appointment in the United States is a naked power, as at common law; and that the power is at an end when it has been executed. This would determine the power after it had been used; and it could not afterwards be regained. Is it to be held, in the United States, that the power to appoint to office gives the appointing power a right to appoint for life only? The English doctrine on this subject has nothing to do with the laws of the United States, where such powers are given only by special enactments.

The case cited from 3 Massachusetts Reports, has no application to the case before the Court. That case decided no more than that the local laws of the colony of Massachusetts made a settled minister of a congregation a minister for life; and the new constitution of the State of Massachusetts had not abrogated that law.

The question whether, when a new office is created by an act of parliament, or a statute of the United States, it is an office for life or not, has never been presented for decision. In this case the question is presented in its naked simplicity. This question has, recently, been considered in the Court of Appeals of Virginia. The question there was on the removal of a district attorney, who is appointed by the Court. The officer was removed without fault, and the question of the right of removal came before the Court of Appeals. It was decided that the power was complete.

The government of the United States was brought into existence in all its proportions and organization, without any of the relics of the barbarism of the darker ages attached to it. It has many beauties, and some defects. It is a new being starting into life, in all its regulations and arrangements. It is not like a statute, which is in abrogation of the common law; but it is independent in itself. It is an experiment, to be examined by itself. The Constitution provided for the terms of all offices created by it. This has been interpreted, so that the power to appoint has, as incident and inherent in it the

power to remove, when thought proper; unless a special provision has been made to the contrary.

The question is, what are the incidents to the power of appointment? If the power to appoint is given, it must be a continuing and constantly existing power; and to be exercised at the will of the person holding it. The term power to appoint, comprehends this; and makes it a continuing power always in vigour.

This has been the course of the government of the United States; and it has always been considered that an officer is displaced when a successor to the office is appointed. This places in full existence and in a simple form, the power to appoint; non obstante, that the office is full at the time of the exercise of the power.

It is contended that the appointment of a clerk of the District Court is not a judicial act, but is like the power which, under the Constitution, is given to the President of the United States, and is identical in its character with that power. The great object and purpose of the counsel for the relator has been to show that the executive of the United States has the power to appoint by the Constitution; and that the appointment in this case is not given by the Constitution. Cited as to the nature of the power of appointment given by the Constitution to the President, 5 Marshall's Life of Washington, 196.

The discussions in the legislative bodies, soon after the establishment of the government of the United States, did not draw into question the power of removal, as incident to the power of appointment. The only question then examined was, whether, as the Senate was a part of the appointing power, the Senate should not concur as to removals.

The Constitution of the United States declares that the executive power is in the President; and the limitation of appointments is a diminution of that power, and it is to be strictly construed. The President is charged with the execution of the laws; and the grant of executive power gives to the officer all the rights in relation to the execution of the laws that kings or potentates have. This is derived from the nature of the duties enjoined on the office, and the obligation to perform them.

It is now settled and established, and the position is not to be disturbed, that the President of the United States has the power to remove or displace incumbents, as he has the power to appoint to office. This, it is now fully settled, is a portion of the executive power under the Constitution; and the right to use and exercise it, in all cases where the tenure of office is not otherwise declared by the Constitution and laws, is fully and unquestionably recognised. It is the universal practice to use the power to appoint, according to the views and wishes of the person who makes the appointment. The motives to appoint do not enter into the question of the validity of the appointment.

Suppose a judge to give a decision expressly on the face of it erroneous, as from favour to one of the parties, and stating this as the

inducement to his judgment, and which, according to his opinion, was against the law; would the decision be reversed in this Court, because of these reasons of the judge, if the decision was right? If it was according to the law, this Court would affirm the judgment. So the motives for the removal of the relator cannot be inquired into by this Court. The Court can only look at the question of the power of the judge to remove, without going into a scrutiny of his motives and conduct.

If there has been corruption in an appointment, the appointment is not thereby vacated. Suppose a judge convicted of fraud in the act of appointment, this does not affect its validity. If the President of the United States should be impeached, would his acts as President be avoided by his conviction?

Mr. Justice THOMPSON delivered the opinion of the Court.

This is an application for a rule upon the Honourable Philip K. Lawrence, Judge of the District Court of the United States for the eastern district of Louisiana, to show cause why a mandamus should not be issued against him, requiring him to show cause why he should not restore Duncan N. Hennen to the office of clerk of the said District Court.

The petition sets forth, that the petitioner, Duncan N. Hennen, on the 21st day of February, in the year 1834, was duly appointed clerk of the said Court, by the Honourable Samuel H. Harper, judge of the said Court. That a commission was duly issued, under the hand and seal of the judge. That he accepted the appointment, and gave the bond with sureties required by law, and thereupon entered upon the duties of the office, and continued to discharge the same, methodically, skilfully, and uprightly, and to the satisfaction of the District Court. That by virtue of said appointment, and of the provisions of the statute in such case made and provided, he was from the period of the organization of the Circuit Court of the United States for the said district of Louisiana, in like manner the clerk of the said Circuit Court; and performed all the duties of said office. That he continued to perform the said duties, and receive the emoluments, and in all respects to hold and occupy said offices, until on or about the 18th day of May, in the year 1838, when he received a communication from the Honourable Philip K. Lawrence, then and now the judge of the said District Court of the United States, for the said eastern district of Louisiana, apprizing him of his removal from the said office of clerk, and the appointment of John Winthrop in his place. And in this communication he states, unreservedly, that the business of the office for the last two years had been conducted promptly, skilfully, and uprightly, and that, in appointing Mr. Winthrop to succeed him, he had been actuated purely by a sense of duty and feelings of kindness towards one whom he had long known, and between whom and himself the closest friendship had ever subsisted. And that, as his capacity to fill the office cannot be questioned, he felt that he was not exercising

any unjust preference, in bestowing on him the appointment.   The petition further states, that Judge Lawrence did, on or about the 18th day of May, in the year 1838, execute and deliver to the said John Winthrop a commission or appointment, as clerk of the said District Court for the eastern district of Louisiana; and that he does to a certain extent execute the duties appertaining to the said office, and is recognised by the said judge as the only legal clerk of the said District Court.

The petition further states, that on or about the 21st day of May, in the year 1838, the Circuit Court of the United States, for the eastern district of Louisiana, met according to law; when the Honourable John M'Kinley, one of the associate Justices of the Supreme Court of the United States, and the said Judge Lawrence, appeared as judges of the said Circuit Court, and that the petitioner and John Winthrop, severally presented themselves, each claiming to be rightfully and lawfully the clerk of the said Circuit Court; that the judges differed in opinion upon the said question of right, and being unable to concur in opinion, neither of said parties was admitted to act as clerk, or recognised by the Court as being rightful clerk; and no business was or could be transacted, and the Court adjourned.

The petitioner claims that he was legally and in due form appointed clerk of said District Court; and by virtue of said appointment became lawfully the clerk of said Circuit Court.   And that he has never resigned the said offices, or been legally removed from the same, or either of them.   But that he is illegally kept out of the said office of clerk of the said District Court, by the illegal acts and conduct of the said Philip K. Lawrence, judge as aforesaid, and the said John Winthrop, claiming to hold the said office under an appointment from the said Judge Lawrence; which he is advised and believes is illegal and void.   And prays that the Court will award a writ of mandamus, directed to the said judge of the District Court, commanding him forthwith to restore the petitioner to the office of clerk of the said District Court of the United States for the eastern district of Louisiana.

The district judge has appeared by counsel to oppose this motion, and the facts set out in the petition have not been denied.   And the question presented to the Court is, whether the petitioner has shown enough to entitle him to a rule to show cause why a mandamus should not issue.   If he has been legally removed from the office of clerk, there are no grounds upon which the present motion can be sustained.

By the Constitution of the United States, art. 2, s. 2, it is provided that the President shall nominate, and by and with the advice and consent of the Senate, shall appoint certain officers therein designated, and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law; but the Congress may by law vest the appointment of such inferior officers, as they shall think proper, in the President alone, in the Courts of law, or in the heads of departments.   The appointing

y 2

power here designated, in the latter part of the section was no doubt intended to be exercised by the department of the government to which the officer to be appointed most appropriately belonged.  The appointment of clerks of Courts properly belongs to the Courts of law; and that a clerk is one of the inferior officers contemplated by this provision in the Constitution cannot be questioned.  Congress, in the exercise of the power here given, by the act of the 24th of September, 1789, establishing the judicial Courts of the United States, 1 Story's Laws U. S. 56, s. 7, declare that the Supreme Court, and the District Courts shall have power to appoint clerks of their respective Courts; and that the clerk for each District Court shall be clerk also of the Circuit Court in such district.

When this law was passed, Louisiana formed no part of the United States, and of course had no District Court, to which the act of 1789 would apply.  But by the act of the 26th of March, 1804, 2 Story's Laws, 933, providing for the temporary government of Louisiana, a District Court is established; and the law directs that the judge thereof shall appoint a clerk for the said district, who shall keep the records of the Court, and receive the fees provided by law for his services.  And a like provision is made by the act of April 8, 1812, 2 Story, 1225, passed for the admission of Louisiana into the Union.  And by the act of the 3d March, 1837, 4 Story, 2538, extending the Circuit Court system, and embracing Louisiana in the ninth circuit, it is declared, that the said Circuit Court shall be governed by the same laws and regulations as apply to the other Circuit Courts of the United States; and the clerks of the said Courts respectively, shall perform the same duties, and be entitled to receive the same fees and emoluments, which are by law established for the clerks of the other Circuit Courts of the United States.  The clerk of the district Court, therefore, in Louisiana, became the clerk of the Circuit Court; standing upon the same footing in all respects as the clerks of the other District Courts.  His rights or his duties were in no respect changed by the establishment of a Circuit Court in that state; except, that the duties of a clerk of that Court were superadded to those of a clerk of the District Court.  And this was by express provision of law; and required no act on the part of the Circuit Court to constitute him clerk of that Court.

Such then being the situation in which the petitioner stood prior to the 21st of May, 1838, the question arises whether the district judge had the power to remove him, and appoint another clerk in his place.

The Constitution is silent with respect to the power of removal from office, where the tenure is not fixed.  It provides, that the judges, both of the supreme and inferior Courts, shall hold their offices during good behaviour.  But no tenure is fixed for the office of clerks.  Congress has by law limited the tenure of certain officers to the term of four years, 3 Story, 1790; but expressly providing that the officers shall, within that term, be removable at pleasure; which, of course, is without requiring any cause for such removal.  The clerks of Courts are not included within this law, and there is

no express limitation in the Constitution, or laws of Congress, upon the tenure of the office.

All offices, the tenure of which is not fixed by the Constitution or limited by law, must be held either during good behaviour, or (which is the same thing in contemplation of law) during the life of the incumbent; or must be held at the will and discretion of some department of the government, and subject to removal at pleasure.

It cannot, for a moment, be admitted, that it was the intention of the Constitution, that those offices which are denominated inferior offices should be held during life. And if removable at pleasure, by whom is such removal to be made. In the absence of all constitutional provision, or statutory regulation, it would seem to be a sound and necessary rule, to consider the power of removal as incident to the power of appointment. This power of removal from office was a subject much disputed, and upon which a great diversity of opinion was entertained in the early history of this government. This related, however, to the power of the President to remove officers appointed with the concurrence of the Senate : and the great question was, whether the removal was to be by the President alone, or with the concurrence of the Senate, both constituting the appointing power. No one denied the power of the President and Senate, jointly, to remove, where the tenure of the office was not fixed by the Constitution ; which was a full recognition of the principle that the power of removal was incident to the power of appointment. But it was very early adopted, as the practical construction of the Constitution, that this power was vested in the President alone. And such would appear to have been the legislative construction of the Constitution. For in the organization of the three great departments of state, war, and treasury, in the year 1789, provision is made for the appointment of a subordinate officer by the head of the department, who should have the charge and custody of the records, books, and papers appertaining to the office, when the head of the department should be removed from the office of the President of the United States. 1 Story, 5. 31. 47. When the navy department was established in the year 1798, 1 Story, 498, provision is made for the charge and custody of the books, records, and documents of the department, in case of vacancy in the office of secretary, by removal or otherwise. It is not here said, by removal by the President, as is done with respect to the heads of the other departments; and yet there can be no doubt that he holds his office by the same tenure as the other secretaries, and is removable by the President. The change of phraseology, arose, probably, from its having become the settled and well understood construction of the Constitution, that the power of removal was vested in the President alone, in such cases; although the appointment of the officer was by the President and Senate.

In all these departments power is given to the secretary, to appoint all necessary clerks; 1 Story, 48; and although no power to remove is expressly given, yet there can be no doubt, that these clerks hold their office at the will and discretion of the head of the depart-

ment.   It would be a most extraordinary construction of the law, that all these offices were to be held during life, which must inevitably follow, unless the incumbent was removable at the discretion of the head of the department : the President has certainly no power to remove.   These clerks fall under that class of inferior officers, the appointment of which the Constitution authorizes Congress to vest in the head of the department.   The same rule, as to the power of removal, must be applied to offices where the appointment is vested in the President alone.   The nature of the power, and the control over the officer appointed, does not at all depend on the source from which it emanates.   The execution of the power depends upon the authority of law, and not upon the agent who is to administer it.   And the Constitution has authorized Congress, in certain cases, to vest this power in the President alone, in the Courts of law, or in the heads of-departments; and all inferior officers appointed under each, by authority of law, must hold their office at the discretion of the appointing power.   Such is the settled usage and practical construction of the Constitution and laws, under which these offices are held. The tenure of ancient common law offices, and the rules and principles by which they are governed, have no application to this case. The tenure in those cases depends, in a great measure, upon ancient usage.   But with us, there is no ancient usage which can apply to and govern the tenure of offices created by our Constitution and laws.   They are of recent origin, and must depend entirely upon a just construction of our Constitution and laws.   And the like doctrine is held in the English Courts, where the office is not an ancient common law office, but of modern origin, under some act of parliament.   In such a case, the tenure of the office is determined by the meaning and intention of the statute.   The case of Smyth vs. Latham, 9 Bing. 672, was governed by this rule.   The office in question was that of paymaster, appointed under an act of parliament; and the Court said : This is not an ancient common law office, the tenure of which is to be governed by ancient usage ; and the question is no more than an inquiry into the meaning and intention of the statute itself : and that by the legal construction of the act of parliament, the tenure of the office was during pleasure ; and that the new appointment was of itself a revocation of the first.

And the same rule has governed the decisions of the State Courts in this country, whenever the power of appointment and tenure of office has been drawn into discussion.   The questions have been governed by the construction given to the constitution and laws of the state where they arose.

The case of Avery vs. The Inhabitants of Tyringham, 3 Mass. 177, falls within this class of cases.   The Chief Justice there says, it is a general rule, that an office is held at the will of either party ; unless a different tenure is expressed in the appointment, or is implied by the nature of the office, or results from ancient usage.   The office held by the petitioner clearly falls within neither of these exceptions, and of course comes within the general rule, and is held

at the will of either party. The petitioner would doubtless claim the right to resign the clerkship if he chose so to do. And the Court had a right to put an end to it, at its election.

The same principle governed the Supreme Court of Pennsylvania, in the case of Leghman *vs.* Sutherland, 3 Serg. and Rawle, 145. The question there turned upon the construction of the Constitution and law of Pennsylvania. By the Constitution of 1790, it is provided that the governor shall appoint all officers, whose office is established by the Constitution, or shall be established by law ; and whose appointments are not otherwise provided for. And the Court said, " The Constitution is silent as to the removal of officers. Yet it has been generally supposed that the power of removal rested with the governor, except in those cases where the tenure was during good behaviour:" clearly recognising the principle, that the power of removal was incident to the power of appointment, in the absence of all constitutional or legislative provision on the subject. The case of Hoke *vs.* Henderson, 4 Devereux, 1, decided in the Supreme Court of North Carolina, is not at all in conflict with the doctrine contained in the cases referred to. That case, like the others, turned upon the Constitution and laws of North Carolina ; and by the express terms of the law, the tenure of the office was during good behaviour ; and was, of course, governed by very different considerations from those which apply to the case now before the Court.

The law giving the District Courts the power of appointing their own Clerks, does not prescribe any form in which this shall be done. The petitioner alleges that he has heard and believes that Judge Lawrence did, on the 18th day of May, 1838, execute and deliver to John Winthrop, a commission or appointment as clerk of the District Court for the eastern district of Louisiana, and that he entered upon the duties of the office, and was recognised by the judge as the only legal clerk of the District Court. And in addition to this, notice was given by the judge to the petitioner, of his removal from the office of clerk, and the appointment of Winthrop in his place ; all which was amply sufficient, if the office was held at the discretion of the Court. The power vested in the Court was a continuing power ; and the mere appointment of a successor would, per se, be a removal of the prior incumbent, so far at least as his rights were concerned. How far the rights of third persons may be affected is unnecessary now to consider. There could not be two clerks at the same time. The offices would be inconsistent with each other, and could not stand together. If the power to appoint a clerk was vested exclusively in the District Court, and the office was held at the discretion of the Court, as we think it was ; then this Court can have no control over the appointment or removal, or entertain any inquiry into the grounds of removal. If the judge is chargeable with any abuse of his power, this is not the tribunal to which he is amenable : and as we have no right to judge upon this matter, or

power to afford redress if any is required, we abstain from express-ing any opinion upon that part of the case.

The motion is accordingly denied.

On consideration of this motion, and of the arguments of counsel thereupon, had, as well in support of as against the motion, it is now here considered, ordered, and adjudged, by this Court, that the said motion be, and the same is, hereby overruled; and that the said mandamus or rule prayed for be, and the same is, hereby denied.