*M. G. Bright*, *R. J. Bright* and *C. E. Walker*, for appellees.

---

WOOD v. SELBY.

WARDEN OF NORTHERN PRISON—REMOVAL OF.—Under the law governing the Northern State Prison, the board of control of the prison have no power to remove the warden from office before the expiration of his term, except for cause, and where no cause is assigned, such attempted removal is illegal and void.

APPEAL from the *Marion* Common Pleas.

ELLIOTT, C. J.—Suit by *Selby* against *Wood* to recover the possession of a book case, of the value of $100. *Wood* answered by a general denial. The issue was tried by the court, who found for the plaintiff, and, over a motion for a new trial, rendered judgment on the finding. *Wood* appeals.

The evidence is made a part of the record by a bill of exceptions, and consists solely of an agreement of facts between the parties, from which it appears that the right to the book case depends upon the question, which of the parties litigant is legally entitled to the office of warden of the Northern State Prison, claimed by both.

The agreement is as follows:

"It is agreed by the parties to this suit, that the right to the possession of said property depends on the following facts, to-wit:

"The defendant was, by the proper board of directors, appointed warden of the Northern State Prison, on the

11th day of *March*, 1863, for the term of four years, gave bond, and was duly qualified and commissioned, and entered upon the duties of said office, and has continued therein to this date. That, on the —— day of June, 1865, the said board, without assigning any reason or cause, removed said defendant from said office, and, on the same day, said board appointed said plaintiff to said office, as warden of said prison, who then and there gave proper bond, and was duly qualified. Now, if said board had power to remove said defendant from said office, without assigning any cause or reason therefor, and appoint said *Selby* to said office, then the plaintiff is entitled to said property, and to a judgment.

"This question is presented in good faith, to try the right to said office, and no question is to be presented or tried, but the power of the board thus to remove the old warden and appoint a new one; and the defendant may file a general denial, and give in evidence any fact bearing on the point."

> A. ELLISON, *Attorney for Selby.*
> McDONALD & ROACHE, *for defendant."*

Without discussing the propriety of the form of action adopted, to try the conflicting claims of the parties to a public office, we will examine the question presented by the agreement.

The solution of the question must depend on the construction to be given to certain legislative enactments, which do not possess the merit of that fullness of expression and clearness of meaning so desirable in statute laws.

In 1859, the legislature passed an act entitled, "An act to provide for the erection of a new prison north of the National road, election of officers therefor, making appropriations, and for the regulation of the same." It provides for the election, by a joint vote of the general assembly, of three directors, who are constituted a board of control, to superintend the construction of a state prison north of the

National road, and who shall hold their office for the term of two years, and until their successors are elected and qualified. It made it the duty of the board of control to select, in the northern part of the state, a suitable site for the location of a state prison; and when the site so selected should be approved by the governor, it was the duty of the board of control to advertise for proposals for the erection of the prison, upon such plan, embracing walls, cell-houses, offices, and such other necessary buildings and fixtures as might be required to complete the establishment for the accommodation of the necessary officers and three hundred convicts, and the safe keeping thereof; and that, in letting the contract, or contracts, they should "provide for the working of one hundred and fifty convict laborers on the premises, at not less than seventy cents per day each." It was also made the duty of the governor, when necessary, to give his order on the warden of the old state prison for said number of convicts, whose duty it was, from time to time, to detail for such purpose the most trustworthy of such convicts, then in prison, as might be required, with a suitable number of guards for their control and safe keeping; and further provided, that the board of directors, before the removal of said prisoners, should provide a place for their temporary safe keeping during the time they should be employed on said prison.

Section 7 enacts that, "A competent and skillful person shall be selected by the said board, who shall remain on the prison grounds, and superintend the erection thereof, and see that the work is faithfully and well done, according to contract, and shall make monthly estimates of the work done, under oath, and also the amount of convict labor performed in the same time, and file the same with the auditor of state, who shall, in issuing his warrant to the contractor, or contractors, after deducting the convict labor performed for each, retain ten per cent. from the estimate, until the work is fully completed according to the contract made."

The ninth section provides that, "The person whose appointment is provided for in section 7 of this act, shall, under the supervision and control of the board aforesaid, discharge the duties of warden of said prison, until his successor is elected and qualified, or until he shall be removed, and a new appointment be made by the said board, who are hereby invested with full power for that purpose."

Section 13 reads thus: "All laws and regulations in force in reference to the government of the convicts, officers, and other matters in the present state prison, shall be continued in force in reference to the management and control of this prison, so far as the same can be made applicable."

This act makes no provision authorizing persons convicted of crimes to be sent to the northern prison, as a prison for punishment. We have given the substance of its material provisions, for the purpose of showing that its primary or principal object was to provide for the *building* of a new state prison in the northern part of the state, preparatory to the reception of convicts, and not for the officering and governing the same as a prison in existence, receiving convicts. And, but for the fact that it was deemed expedient to work a part of the convicts, then in the old prison, to aid in the construction of the new one, there would have existed no necessity for providing that any person should discharge the duties of warden, as no such duties would have existed. But, as the act only provided for the use of a limited number of convicts temporarily, and for a specified purpose, it seems not to have been deemed expedient to require the election of a regular warden during such time; and hence the provision, that the person appointed to superintend the work in the construction of the prison, should, under the direction and control of the board of directors, discharge such duties of warden as might result from the employment, for the time, of a limited number of convicts.

The law very properly provided that a competent and skillful person should be selected to superintend the con-

struction of the work, and see that it was done according to contract, and make the proper estimates of the amount done, at stated periods, upon which the contractors received their pay. These were his principal and important duties, and, hence, it was required that he should be selected with reference to his skill and ability for their faithful performance.

With these preliminary observations, we pass to a more critical examination of section 9. It provides that the person appointed to superintend the work, under section 7, "shall, under the supervision and control of the board aforesaid, discharge the duties of warden of said prison, *until his successor is elected and qualified,* or until he shall be removed, and a new appointment be made by the said board, who are hereby invested with full power for that purpose." Now, looking to the provisions of the act of 1859, alone, it seems evident that the directors have no power to elect or appoint a warden, as such, or to authorize any other than the person selected to superintend the work on the prison, to discharge the duties of warden, or to allow the person so appointed any other or greater compensation, for all the services required of him, than three dollars per day for the time employed, unless such power can be inferred from the words used in the ninth section, "*until his successor is elected and qualified,*" taken in connection with section 13.

The transposition of the last two members of the ninth section, without altering the sense, will, we think, render the proper meaning of the section more palpable. It would then read, that the person appointed to superintend, &c., "shall, under the supervision and control of the board aforesaid, discharge the duties of warden of said prison, until he shall be removed, and a new appointment be made by the board, who are hereby invested with full power for that purpose, *or until his successor is elected and qualified.*" If these latter words have any meaning, as used in the section, we think they must relate to the election and qualification of a warden, as such, and not to the person

appointed to superintend the work on the prison, and who is required to discharge the duties of warden for the time. The latter is not referred to in the act as a person to be elected or qualified, either by taking an oath or giving a bond. He is not even denominated in the act as a superintendent, but as "a person" selected or appointed, whose duty it shall be to superintend, &c. We do not think that he can be considered an *officer* of the prison, in the proper legal sense of that term, but simply as an employee of the board of directors, selected by them, subject to their direction and control, and liable to be dismissed and removed by them at pleasure, and whose employment would necessarily cease when the prison should be completed. It is to this "person" that the ninth section refers, in providing that he shall discharge the duties of warden "until he shall be removed and a new appointment be made by said board, who are hereby invested with full power for that purpose," and not to a warden of the prison, regularly elected and qualified.

By the thirteenth section, the laws and regulations in reference to the old prison, for the government of the convicts, officers and other matters, are put into force in reference to the management and control of the new one, as far as the same can be made applicable. None of the laws and regulations referred to could be made applicable until the contract for the construction of the new prison was let, and the work commenced, nor then, until there was something in existence for them to apply to. As the work on the new prison progressed, in connection with the employment of convict labor, these laws and regulations would be brought into active force by the existence of that to which they would properly apply, until finally, when the prison should be completed, or had so far progressed toward completion as to justify making it a receiving prison for convicts, then, perhaps, all the laws and regulations of the old prison, not inconsistent with the express provisions of the statute authorizing the building of the new one,

would become applicable to it, and if so, they are made to apply by the thirteenth section.

By an act approved *June* 1, 1861, to authorize the removal of convicts from the southern to the northern state prison, &c., Acts of 1861, special session, p. 81, the governor was required to direct the removal of two hundred convict laborers from the prison at *Jeffersonville* to the northern prison, and it was made the duty of the warden of the northern prison to receive and properly take care of them, and employ them in the best manner to insure the speedy completion of the work on said prison.

The second section of that act provides, "That hereafter, when any male person, or persons, shall be convicted and sentenced to imprisonment in the state prison, by any court of competent jurisdiction, in the counties of *Warren, Fountain, Montgomery, Boone, Hamilton, Madison, Delaware* and *Randolph,* and in any county lying north of said counties, within this state, it shall be the duty of the sheriff, or officer having charge of such person, or persons, so convicted, to convey the said person, or persons, to the northern state prison, and the warden of said prison shall receive all persons so delivered to his care, and keep them until the expiration of their sentence, unless sooner discharged according to law." Thus, it is seen that the northern prison became the receptacle for all convicts from a specified portion of the state, and the *third* section of the same act provides that, in the event of an emergency therein stated, a part, or all, of the convicts in the southern prison may be sent to the northern prison.

These provisions seem to render it proper, if not absolutely necessary, that the northern prison should be fully officered, and placed under proper discipline and government, requiring that all the laws and regulations in reference to the southern prison, for the government of the convicts, officers and other matters, should be applied to the northern prison, as far as the same could be made applicable.

Section 4, of the act of 1857, in reference to the southern prison, provides that, "the directors shall elect a warden, who shall hold his office for the term of four years, unless sooner removed by the directors for cause, which cause shall be entered on the journal of the institution. The warden shall receive as a compensation for the services required of him by law, such yearly salary, not exceeding sixteen hundred dollars, as to the directors may appear reasonable," &c. "The warden shall take and subscribe an oath or affirmation that he will faithfully and impartially discharge the duties of his office, and he shall give bond to the State of Indiana, in the sum of thirty thousand dollars, with surety," &c. This is the only law that we are aware of, authorizing the election of a *warden* of either of the state prisons, and the only one requiring the warden to qualify, by being sworn and giving a bond for the faithful discharge of his duties. If it is applicable to the northern prison, so far as to authorize the directors to elect a warden, and require that he shall take an oath of office, and give bond, we are at a loss to see why it is not also applicable to the term of his office, and the mode and cause of his removal.

We therefore conclude, that at the time *Wood* was elected or appointed to the office of warden, and at the time of his removal from said office, the section of the act of 1857, above quoted, was in force, and was applicable both to his election and removal; that having been elected in 1863, for the term of four years, and having taken the proper oath of office, and given bond as required by the law, he was entitled to hold the office for the full term of four years, unless removed for cause; and that, as no cause was given or assigned for his removal, such removal was illegal and void. The judgment of the court below must, therefore, be reversed.

The judgment is reversed, with costs, and the cause remanded.

Mr. Justice FRAZER dissented, and delivered the following opinion :

I cannot concur with the majority of the court in the construction of the ninth section of the act of 1859, 1 G. & H. 472. That the "person" whose appointment is provided for by section 7, is an officer, seems to me plain. The English definition of an officer, as given by the courts and text writers of that country, is, of course, not applicable here, because, under our institutions, officers can only be public. The American definition, as given, is, " the right to exercise a public function or employment, and take the emoluments belonging to it," 2 Bouv. L. Dic. 260; 3 Serg. & R. 149. An officer, then, is one lawfully exercising the functions of an office. That he might be removed at the pleasure of the board of control does not change the matter, for the power of removal of an officer at will is incident to the power of appointment, unless the statute has otherwise provided. *Ex parte Hennen,* 13 Pet. 230. In this case his duties are public, are exceedingly important and responsible, and his pay is not the subject of contract, but is fixed by law. I know not what more is necessary to constitute an officer. If an officer, then he was required by law to take an oath of office. 1 G. & H. 163. It was a singular oversight in legislation that a bond was not required of him, holding, as he does, the key which admits the contractors to the public treasury, and charged also, as he is, for a time, at least, and I think, during his continuance in office, with the duties of warden.

He must, under the control of the board, discharge the duties of warden of the prison. How long? Not until the board think proper to lessen his duties by appointing a warden, but so long as he remains in office, — "until his *successor* is elected and qualified, or until he shall be *removed,* and a new appointment be made by the board, who are hereby (by the act,) invested with full power for that purpose." If he be not out of office, he can have no *successor;* nor can he be *removed,* and yet continued, without

interruption, in the same office, though relieved of a portion, and the least pleasant, of his duties. If it had been intended to empower the board so to relieve him, by electing a warden, whenever, in their judgment, that would be desirable, it seems to me in the highest degree improbable that the legislature would not have employed language better calculated to express that purpose.

There was, and yet is, an obvious reason for charging the person who superintends the construction of the prison with the duties of warden, and providing that he should be removable at the will of the board. It was contemplated that the prisoners would labor upon the structure. They should be controlled by the person who superintends the work, that the best interests of the state may be subserved, by securing harmony in the use of this force which labors for the state, and thus insuring its greatest efficiency; and by making the duration of that person's office depend upon the will of the board of control, who are provided for the express purpose of guarding the public interests, he is put immediately under their direction, with the strongest motive to deserve their full confidence. A warden, whose official term, in the old prison, is four years, and who cannot be removed except for cause, and who is the chief executive officer of the institution, would be more independent. The new prison thus officered, while being built, would have too many executives, with danger of the usual result thereof, as all experience proves, divided counsels and consequent inefficiency in accomplishing the chief end sought, which was the erection of the prison, by no means accomplished in 1863, or even now.

I believe that this person, who is to superintend the work, and also discharge the duties of warden, by the act of 1859, has, from the beginning, in the official public reports, been called "warden," though the act does not give a name to his office. Doc. Jour. 1861, pp. 443, 438, 440, 446-455, 494; Doc. Jour. 1863, vol. 1, part 2, pp. 54, 56, 63, 67, 141. The legislature itself, in a public law,

passed two years before any attempt was made to confer upon him the term of four years, belonging to the warden in the old prison, so designated his office. Acts Special Ses. 1861, § 1, p. 81. By this designation it seems that both *Wood* and *Selby* were appointed. For brevity, it is, perhaps, as appropriate a term as any to indicate the office, and certainly it is sufficiently definite for that purpose. The law fixes its tenure and points out its duties, and it is clear that the directors, by giving it a name, could not change either the one or the other, nor could they, by electing him for four years, deprive themselves, or their successors, of whatever power of removal may be conferred by law.

If I am correct in the foregoing observations, the conclusion inevitably results, that the person whose appointment is provided for in section 7 of the act, must discharge the duties of warden of the northern prison, and that he may be removed at the pleasure of the board of control. It would follow that the board had power to remove the appellant, as they did, and appoint the appellee, and that the latter is now entitled to exercise the duties of his appointment. This conclusion is somewhat confirmed by the history of the passage of the act through the legislature. It appears by the journals that it originated in the House of Representatives, and passed that body without the thirteenth section, which extends the laws relating to the old prison to the new one, so far as applicable. It is thus quite evident that section 9 was not framed with any view to confer authority upon the board of control to take the duties of warden from the person whom section 7 requires to be appointed. Section 13 was added in the senate, as an amendment. Senate Jour. 1859, p. 920. That it was not intended thereby to change the effect of the language employed in section 9, seems clear to me. It was, I think, merely designed to cover what was omitted in the bill as it passed the house, by providing additional and necessary machinery for the organization and management of the new institution,

which should be entirely in harmony with the provisions already contained in the bill.

*J. E. McDonald* and *A. L. Roache,* for appellant.

*A. Ellison,* for appellee.