BUTLER v. WHITE, Collector of Revenue, et al. BERRY v. SAME. RUCKMAN v. SAME.

(Circuit Court, D. West Virginia. November 8, 1897.)

1. OFFICERS OF THE UNITED STATES—CIVIL SERVICE LAW.
   The act known as the "Civil Service Act" is constitutional.

2. SAME—DELEGATION OF LEGISLATIVE POWERS.
   Congress has not delegated to the president and the commission legislative powers.

3. SAME.
   By rule 3, § 1, the internal revenue service has been placed under the civil service act and rules made in pursuance of it.

4. SAME—WHO ARE OFFICERS.
   The plaintiffs in these actions are officers of the government in the internal revenue service.

5. SAME—REMOVAL FROM OFFICE.
   They cannot be removed from their positions except for causes other than political, in which event their removal must be made under the terms and provisions of the civil service act and the rules promulgated under it, which, under the act of congress, became a part of the law.

6. SAME.
   The attempt to change the position and rank of the officers in these cases is in violation of law.

7. SAME—EQUITY JURISDICTION.
   A court of equity has jurisdiction to restrain the appointing power from removing the officers from their positions if such removals are in violation of the civil service act.

(Syllabus by the Court.)

These were bills in equity filed against A. B. White, collector of internal revenue for the district of West Virginia, and others, by William Butler, H. C. Berry, and J. G. Ruckman, respectively, to enjoin the defendants from removing them from their positions as gauger and storekeeper, in a distillery, or from transferring them to other and subordinate positions.

Chas. J. Faulkner, for complainants.

John W. Mason, for commissioner of internal revenue.

Joseph H. Gaines, U. S. Dist. Atty., for defendant White.

JACKSON, District Judge. These causes are now heard upon the bills of plaintiffs and the demurrers and answers of defendants, which, by stipulation of counsel, are heard together. The object and purpose of the bills are to restrain the defendants from removing the plaintiffs in this action from their present positions as gauger and storekeeper, respectively, in the Hannis Distillery, or transferring them to any other and subordinate positions in the same distillery. These officers were commissioned by the government, and assigned to duty, and were in the active discharge of the functions of their respective offices when the defendant White was appointed collector of internal revenue for the district of West Virginia. It is alleged in the bills that this defendant is about to remove the plaintiffs in these actions upon political grounds, and it is claimed that neither the defendant nor the appointing power has the right or power to remove the incumbents from their offices for political reasons. The demurrers to the bills in these cases raise 14 grounds of objection, which may all be embraced in three points:

First. Is the act of congress known as the "Civil Service Act," passed in 1871, and as amended in 1883, constitutional? In considering this question, it is well to refer to the history of the country which finally led to the passage of this act. The learned counsel who argued these cases on behalf of the plaintiffs reviewed, to some extent, the action of the various administrations of this government from that of Washington down to 1820, when congress passed an act fixing, for the first time, the tenure of office for district attorneys and marshals of the United States. Prior to this time it appears that removals from office were comparatively few, and that such action, when had, was always for causes other than political. After the passage of the act of 1820, subsequent administrations began to make changes in that class of officers who held their positions at the pleasure of the executive. As the country grew, not only in territory but in population, the thirst and greed for office became so great that a growing necessity was felt that some legislation should be had to correct, as far as possible, the evils growing out of the existing system of appointments. Such was the condition of the public mind of the country that President Grant, one of the greatest men that ever occupied the presidential chair, felt it incumbent on himself, in his annual message of December 4, 1870, to call the attention of congress to the importance and necessity of reform in "the manner of making all appointments." He employs the following strong and striking language in his message, from which I quote:

"Always favoring practical reforms, I respectfully call your attention to one abuse, of long standing, which I would like to see remedied by this congress. It is a reform in the civil service of the country. I would have it go beyond the mere fixing of the tenure of office of clerks and employés who do not require 'the advice and consent of the senate' to make their appointments complete. I would have it govern, not the tenure, but the manner of making, all appointments. There is no duty which so embarrasses the executive and heads of departments as that of appointments; nor is there any such arduous and thankless labor imposed on senators and representatives as that of finding places for constituents. The present system does not secure the best men, and often not even fit men for public place. The elevation and purification of the civil service of the government will be hailed with approval by the whole people of the United States."

In pursuance of this recommendation of President Grant, congress, on the 3d day of March, 1871, passed an act the purpose and object of which, among other things, was "to regulate admissions to the civil service." It appears, however, that this act was insufficient to accomplish the purposes for which it was framed. Its terms and provisions were so criticised that there was a consensus of opinion that further legislation was needed. President Arthur, influenced, no doubt, by the public sentiment of the country, felt it his duty, in his annual message of December 4, 1882, to the Forty-Seventh congress, to call the attention of that body to this subject, in which he employed the following language:

"I trust that, before the close of the present session, some decisive action may be taken for the correction of the evils which adhere in the present method of appointment; and I assure you of my hearty co-operation in any measures which are likely to conduce to that end."

After this recommendation of President Arthur, congress took up the subject, and promptly passed an act "to regulate and improve the civil service of the United States," which was approved by the president on the 16th day of January, 1883. Bills were introduced in both houses of congress, but the bill that was passed by the senate, after much discussion in the house, was passed by the house, and approved by the president. In the discussion that took place upon this bill in the senate some of the most distinguished lawyers of that body participated, among whom were Senator Hoar, of Massachusetts, Senator Edmunds, of Vermont, Senator Brown, of Georgia, Senator George, of Mississippi, Senator Ingalls, of Kansas, Senator Cockerell, of Missouri, and Senator Allison, of Iowa. I refer to the utterances of these distinguished lawyers as part of the contemporaneous history of this act, and it is to be observed that not one of these gentlemen entertained any doubts as to the constitutionality of this act, but the general trend of the discussion seems to have conceded its constitutionality. The utterances of both Senator Hoar and Senator Edmunds maintain its constitutionality, and the skeptical legal mind that differs with me, and entertains doubts as to the constitutionality of the act, is referred to the able discussions that took place at the time it was under consideration.

This court might well content itself with what it has now said, but I am not either without authority or precedent upon this subject. The constitution of the United States (article 1, § 8, cl. 18) confers upon congress the right "to make all laws which shall be

necessary and proper for carrying into execution the foregoing powers and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof." Under this provision of the constitution, congress, as early as the 27th day of July, 1789, passed an act that "the head of each department is authorized to prescribe regulations, not inconsistent with law, for the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use and preservation of the records, papers and property appertaining to it." That act has been in force from the day of its passage to the present time. Here is a power conferred by the authority of congress upon the head of each department, and is in no sense a delegated power of legislation. The evident purpose of congress was to furnish each department with authority to regulate the conduct of its officers and employés, and the distribution and performance of the business of the office. If such a power to legislate had been delegated under that act, the courts of this country would long since have been invoked to pass upon the power of congress to delegate a power to the head of any department which alone belonged to it; but long acquiescence in the act is of itself sufficient evidence of the right of congress to pass it.

Judge Marshall, in his opinion in the case of McCulloch v. Maryland, 4 Wheat. 421, uses the following language, which I think appropriate to the discussion of the question under consideration:

"All must admit that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

In the case of Ex parte Curtis, 106 U. S. 371, 1 Sup. Ct. 381, this doctrine was again affirmed by the supreme court of the United States, in an opinion delivered by Chief Justice Waite, in which he uses the following language:

"That the government of the United States is one of delegated powers only, and that its authority is defined and limited by the constitution, are no longer open questions: but express authority is given congress by the constitution to make all laws necessary and proper to carry into effect the powers that are delegated. Article 1, § 8. Within the legitimate scope of this grant, congress is permitted to determine for itself what is necessary and what is proper."

I assume that, when congress passed these acts, it did determine for itself what was necessary and what was proper; that there was a necessity to remedy the evil growing out of the existing appointments to office; and that the acts passed were constitutional, and therefore proper. Is it not competent, and clearly within the legitimate scope of the powers of congress, under the constitution, to remedy an existing evil? If so, did congress, in the passage of these acts, exceed its legitimate power under the constitution? I think not. Under our system of government, congress, by law, is vested with the power alone to remedy existing evils; but it is the

duty of the executive, when congress by an act applies a remedy, to see that the act is faithfully enforced. When congress undertakes to apply a remedy to an evil by repealing an existing law, or by amending the law, or by the passage of an act which has for its object an improvement of the civil service of the country, can it be said that congress has exceeded its power? I think not. If the time should ever come in the history of this government when congress cannot regulate the administration of the civil service of the country, in my judgment it will be an untoward event, which will strike at the very foundation of the existence of the government.

I reach the conclusion that there can be no question as to the constitutional power of congress to pass these acts. In support of this position I cite clause 18, § 8, art. 1, Const. U. S.; Marbury v. Madison, 1 Cranch, 137; McCulloch v. Maryland, 4 Wheat. 421; Ex parte Hennen, 13 Pet. 259; Ex parte Curtis, 106 U. S. 371, 1 Sup. Ct. 381; U. S. v. Perkins, 116 U. S. 483, 6 Sup. Ct. 449.

The second ground of demurrer is that the assignment or revocation of assignment of these parties to duty is not protected by the provisions of the civil service law or the regulations in pursuance thereof. It is urged that the plaintiffs hold positions not technically in the executive civil service. I cannot agree with this position. Section 1, rule 3, of the revised rules promulgated May 6, 1896, declares that:

"All that part of the executive civil service of the United States which has been or may hereafter be classified under the civil service act, shall be arranged in branches, as follows: The departmental service, the custom-house service, the post-office service, the government printing service and the internal revenue service."

Storekeepers and gaugers are appointed by the secretary of the treasury, and are required by the statute to take an oath to faithfully perform the duties of their offices, and to give bond for the faithful discharge of their duties. The storekeepers are to receive a compensation not to exceed four dollars a day, to be determined by the commissioner of internal revenue, and are not permitted to engage in any other business while in the service of the United States without the written permission of the commissioner of internal revenue. The fees of gaugers are to be determined by the quantity gauged, under such regulations as the commissioner may prescribe. These places held by the plaintiffs are positions of honor and trust, and have attached to them a fair compensation. It is true that their duties are ministerial; yet the faithful discharge of them is so important to the government as to require men of capacity and integrity. Section 6 of the same rule declares that:

"The internal revenue service shall include officers and employés in any internal revenue district who have been, or may hereafter be, classified under the civil service act."

By the direction of the president, the secretary of the treasury classified all persons not before classified in the internal revenue service, except those merely employed as laborers or workmen, and those whose appointments are subject to confirmation by the sen-

ate, and made report to the commission, in pursuance of rule 12, §
1. It must be apparent that gaugers and storekeepers are either
"officers or employés" in the internal revenue department, and it is
immaterial whether they are officers or employés. In either event
they are protected under the rules of the civil service, as they do not
fall within the exception of rule 12, § 1.

The acting commissioner of internal revenue, Mr. G. W. Wilson,
reported to the commission the classification of the internal revenue
service, which was approved by the secretary of the treasury. A
provision of section 7 of the act is that, after the expiration of six
months from the passage of the act, "no officer or clerk shall be
appointed, and no person shall be employed to enter, or be promoted,
in either of the said classes now existing, or that may be arranged
hereunder, pursuant to said rules, until he has passed an examina-
tion or is shown to be specially exempted from such examination in
conformity herewith." But this act provides for certain excep-
tions, one of which is that persons who have been honorably dischar-
ged from the military or naval service are not required to be classi-
fied under this act. By rule 3, § 1, the internal revenue service was
placed in the classified service; and under section 6 there were in-
cluded "the officers and employés in any internal revenue district
who have been or may hereafter be classified under the civil service
act." As we have seen, section 7 forbids the appointment of a per-
son, after the expiration of six months from the passage of the act,
until he has passed an examination or is shown to be specially ex-
empt from such examination in conformity with its provisions.
The plaintiffs in these actions having been more than six months in
possession of the offices from which it is now sought to remove them,
no person can be appointed or employed to take either of said posi-
tions except as provided for in section 7, unless they fall within the
exception to rule 9.

But it is claimed that the assignments made to take the places of
the plaintiffs in these various actions do fall within the exception
to rule 9, which provides that:

"A vacancy in any position which has been, or may hereafter be, classified
under the civil service act, may, upon requisition of the proper officer and the
certificate of the commission, be filled by the reinstatement, without examina-
tion, of any person who, within one year preceding the date of said requisition,
has, through no delinquency or misconduct, been separated from a position in-
cluded within the classified service at the date of said requisition and in that
department or office, and that branch of the service, in which said vacancy
exists."

The answer to this position is that there are no vacancies, and
until vacancies occur, under the rules of the civil service, no assign-
ments can be made. In the cases before us there are no vacancies
in these positions, either by death or resignation; nor can there
be vacancies by removal unless they are in conformity with the civil
service act and the rules and regulations made under it. But it is
insisted that this is not a removal, but a transfer, and that under
the provisions of section 3154 of the Revised Statutes, passed August
15, 1876, the commissioner may transfer any gauger or storekeeper.
That section provides that:

"The commissioner may also transfer any inspector, gauger, storekeeper or storekeeper and gauger from one distillery or place of duty or from one collection district to another."

This section is mandatory and binding upon every officer of the United States who comes within its terms, but it does not authorize the appointing power to make the changes proposed by the defendant collector. It is obvious from the reading of that section that it only authorizes the commissioner to transfer the officers mentioned in it from one place of duty to another place of duty in the same district, or from one collection district to another. It does not in express terms say that you may transfer the officers mentioned in it from one position to another in the same distillery. It was evidently the intention of congress, in the enactment of this clause of that section, to permit transfers as I have indicated; but there is no provision for the reducing of a man in the grade or position that he has held. Congress evidently supposed that, if it became necessary to remove or reduce a man for incompetency to a lower position in the same grade, the appointing power might exercise the power of removal; but, since the passage of the civil service act, that power of removal is now limited and controlled by it, which, being a subsequent act to section 3154, so far as they are in conflict with each other, limits and controls the commissioner in his action.

It is idle to say, as in the instance of Ruckman, in this case, that, where he has held the position of "head or day storekeeper," he can be changed or transferred from that position to that of "additional storekeeper," which is a change in rank, without nullifying the civil service act and the rules in force under it. A transfer of this character from the head or chief position to a secondary position, as that of additional storekeeper necessarily must be, is a change of rank in a public position, which is necessarily a removal that can only be made under the civil service act and the rules formulated under it. Can it be said that a transfer or assignment in the same distillery, from one position to another, does not operate as a removal from one position to the other? Is not the position from which the officer is transferred vacated, and is he not placed in a new position? What can be the object and purpose of a transfer unless it is to remove the incumbent from the position he occupies? As we have before said, these officers held their positions before and at the time the present collector was appointed, and entered upon the discharge of his duties on the 1st day of July, 1897. It is obvious from what appears in these cases that the present collector is attempting to secure a change in positions or a revocation of the assignments of these officers, and to substitute others in lieu of them. If there were vacancies in these offices, of course he would have the right to make recommendations to the commissioner to have persons appointed to fill the vacancies; but there are no vacancies, and none can be created except in case of death or resignation, or in conformity to the civil service act and the rules promulgated under it.

It has been held that an appointment to an office operates as a removal of the then incumbent. An office, when once filled, cannot be deemed vacant until the term of service expires, or until the death

or removal or resignation or abandonment of the incumbent. Waite, Act. & Def. § 14; Keenan v. Perry, 24 Tex. 253; Johnston v. Wilson, 2 N. H. 202. By a provision of clause 2 of section 2 of the civil service act, their positions can only be filled by selection, according to grade, from among those graded highest as the result of competitive examination. It is true that, by a provision of rule 9, certain exceptions are made to that rule, and it is claimed that these parties fall within the exception because they have heretofore held these positions, and seek to be reinstated therein. If, however, there were vacancies, the appointments to fill the positions, to be legal, should be made in pursuance of clause 2 of section 2, in connection with the exceptions contained in rule 9; but there is no pretense upon the part of the appointing power that they ever intended to comply with those provisions of the law. The effort to remove these officers seems to be in violation of the executive order of July 27, 1897, amendatory to civil service rule 2, which provides that:

"No removal shall be made from any position subject to competitive examination, except for just cause, upon written charges filed with the head of the department or other appointing officer, of which the accused shall have full notice and an opportunity to make defense."

The present incumbents hold positions of honor and trust, which positions, I hold, are within the provisions of the civil service act and the rules formulated and adopted in pursuance of it. If I am correct in this position, then these incumbents could only be removed in the manner provided for by that act and the executive order of July 27, 1897. Now, it seems to me no grounds have been shown for their removal, except "for the good of the public service." This is a reason that was employed by the officers of the government, when they desired to remove any one that was obnoxious to them, long prior to the passage of the civil service act. It is too general, vague, and indefinite to authorize the removal of an officer under existing law. By the very terms and provisions of the rule just referred to, he has to be confronted with the charges that are made against him, and to have full notice and an opportunity to make defense. No charges of a specific character have been preferred against these officers; no notice has been served upon them of any charge; and no opportunity has been furnished them to meet the vague and indefinite charge "for the good of the public service." The very object and purpose of the rule which was promulgated on the 27th day of July, 1897, was to furnish a full opportunity to every officer who was within the civil service to meet any charges made against him. This has not been done in this instance, and I must hold that under the rules formulated by the president and the civil service commission, and promulgated by that executive order, the effort to remove the officers in question is illegal. The rules promulgated by the president and the commission are clearly within their scope and power, under the act of congress; and, when they exercise the power to limit and restrict the power of removal as they deem best for the public interest, it is only the execution of a duty imposed upon them by congress, and which should be effectually performed and fully complied with.

To my mind it is clear that storekeepers and gaugers are employés

of the government that are protected by the rules and regulations promulgated under the civil service act by the executive and the commission; that a revocation of the assignments or transfer of the plaintiffs in these actions is in effect a removal, and that a removal for political reasons falls within the inhibition of the civil service act and the rules promulgated under it; that there can be no appointment to any position unless there is a vacancy; and that the vacancy must be filled in conformity to the provisions of the civil service act and the rules made under it.

The third ground of demurrer is that a court of equity cannot enjoin an officer or party from exercising the power of removal. I have heretofore discussed this question in the case of Priddie v. Thompson (United States marshal for this district), and, although some of my brothers have differed with me in the conclusions I reached in that case, yet I have seen nothing emanating from them to shake my convictions. 82 Fed. 186. In discussing a grave and important question of this character, it is well sometimes to have recourse to first principles. Story, who is a standard authority, says that "equity has jurisdiction in cases of rights recognized and protected by the municipal jurisprudence where a plain, adequate, and complete remedy cannot be had in the courts of common law." 1 Story, Eq. Jur. (12th Ed.) § 33; 1 Coop. Eq. Pl. 128, 129; Mitf. Jeremy, Pl. Eq. 122, 123; 1 Wood, Lect. vii. pp. 214, 215. "The remedy must be plain, for, if it be doubtful and obscure at law, equity will assert jurisdiction. It must be adequate, for, if at law it falls short of what the party is entitled to, that founds a jurisdiction in equity." Accepting this definition as not only precise, but descriptive of the powers of a court of equity, does not the case under consideration fall within the jurisdiction of such a court? In the bills filed in these cases it is alleged that the plaintiffs have not only an interest in, but a right to, the possession of the offices they hold, and their emoluments, and to that extent a vested right, of which they cannot be deprived except by operation of law, and not by the capricious action of a superior officer. Has not a person who holds and is in possession of an office to which there is a fair salary attached, to remunerate him for his services, a right to the protection of the law to prevent an injury to him by the doubtful assertion of the rights of another as to his office? Has he not a material interest in the possession of the office and the salary attached to it? If he has such an interest in the office and emoluments, is there not a right which should be recognized and protected by the law in the employment of it? The fact that another party desires and seeks the office is evidence of its value to him, and, if it is valuable to the one seeking it, surely it must be to the one holding it. If no value was attached to the position, there would be no occasion for these proceedings. The fact that they have been instituted to protect the incumbents in the enjoyment of their offices is conclusive evidence that there are some rights involved.

What, then, is the most complete remedy afforded? The plain answer to this question is that the only remedy that is adequate and complete must be of a preventive character, which seeks to restrain the defendants from ousting the plaintiffs from their positions. There

can be no legal remedy, for the reason that the incumbents, when once ousted from their positions, have no recourse whatever. The plaintiffs are entitled to a preventive remedy to preserve the "status quo" until the titles to the different positions and offices can be settled by some legal proceeding. Equity alone furnishes that remedy, and, if this remedy does not exist, then there is a case of an alleged wrong without a remedy. In the progress of a civilization that is giving us railroads, telegraphs, telephones, and numberless other things, all of which are regarded as necessary to both our business and social life, it often becomes necessary to invoke the latent powers of our jurisprudence as a necessity arises which requires it. This jurisdiction is only the application of existing powers in a court of equity to a new case. Courts of equity have exercised their jurisdiction permitting officers de facto of a school district to restrain persons claiming to be officers de jure, but who are not in possession, from taking possession of a school house, and from interfering with the officers de facto in the employment and management of school affairs. Brady v. Sweetland, 13 Kan. 41. The question involved in these proceedings may be said to be analogous to the case just referred to. This injunction is to restrain the defendants from interfering with the plaintiffs in the possession of their offices, and is in no sense to try the right of possession or title to the offices. Proceedings by injunction cannot be used for that purpose.

I think the foregoing views are clearly sustained by Story's Equity Jurisprudence. But I do not rely upon text-books alone to support my views as to this position. In Waite's Actions and Defenses there will be found many references where courts of equity have exercised this jurisdiction where there was a controversy between parties claiming the same office. It will never be assumed to oust a person from an office under a color of title until his right to such office has been determined; but it will be exercised to protect a party in the possession of his office until he has been ousted by a legal proceeding. In a well-considered case by the supreme court of Louisiana it was held that an officer cannot be dispossessed by a third person whose title he disputes until the latter shall first try the disputed right; and the learned judge who delivered the opinion of the court cites the cases of Brady v. Sweetland, 13 Kan. 41, and Palmer v. Foley, 45 How. Prac. 110. The reason is very obvious that a claimant cannot take the law in his own hands, even with the assistance of others, to oust an incumbent in advance of judicial termination of the disputed right; and that court held that "the claimant and all others may be properly enjoined from interference with the party in possession of the office until the dispute can be judicially settled." Guillotte v. Poincy (La.) 6 South. 507.

In the case of Ex parte Sawyer, 124 U. S. 402, 8 Sup. Ct. 482, Chief Justice Waite, referring to the remedy by injunction, uses the following language, which seems to support the view I have taken of the question under consideration:

"I can easily conceive of circumstances under which a removal, even for a short period, would be productive of irremediable mischief. Such cases may rarely occur, and the propriety of such an application may not often be seen;

but if one arises, and if the exercise of the jurisdiction can ever be proper, the proceedings of the court in due course upon a bill filed for such relief will not be void, even though the grounds upon which it is asked may be insufficient."

The law as thus laid down by the learned chief justice in the case cited would seem to dispose of the question under consideration.

In the case of Marbury v. Madison, 1 Cranch, 166, Chief Justice Marshall uses the following language:

"But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured has a right to resort to the laws of his country for a remedy."

Specific duties, in the cases of these plaintiffs, are assigned to them by law, viz. the duties of gauger and storekeepers. The "individual rights" or the rights of the owners of the distillery to which they have been assigned for duty depend to a great extent upon the faithful performance of their duties. They claim to have an "individual right" in the offices they respectively hold, and they conceive themselves to be injured in their rights when there is an effort to remove them from their positions. Under the authority of the cases cited, I hold that they have a right to resort to the courts of their country for a remedy. If they cannot resort to the courts for a preventive remedy to stay the hand of the appointing power in removing them from their positions, then they have no remedy, although the act of the appointing power may be in violation of the civil service act and the rules made under it. It cannot be said that where congress, by its act, has undertaken to limit and restrain the appointing power, and the appointing power attempts to nullify the plain provisions of the act, that there is no remedy.

High on Injunctions says that:

"The plaintiff says: 'I am the actual incumbent in possession of the office to which I claim to be legally entitled. Defendant, claiming under a title the validity of which I dispute, is seeking to oust me extrajudicially, in which effort he will have the aid of my fellow members on the board; and I ask judicial aid to protect my incumbency to the position until defendant shall, in due course of judicial procedure, establish his right and title.' Such an action falls within a well-recognized branch of relief by injunction. While courts of equity uniformly refuse to interfere by the exercise of their preventive jurisdiction to determine questions relating to the title to office, they frequently recognize and protect the possession of officers de facto by refusing to interfere with their possession in behalf of adverse claimants, or, if necessary, by protecting such possession against the interference of such claimants; and the granting of an injunction in such a case in no manner determines the question of title involved, but merely goes to the protection of the present incumbents against the interference of claimants out of possession, and whose title is not yet established." 2 High, Inj. (2d Ed.) § 1315.

It is said by the learned judge who delivered the opinion of the supreme court of Louisiana, supra, that the doctrine as laid down by High "is in the interest of social peace and order, and conforms to the object and policy of the law in all remedial provisions, for the settlement of disputed rights which always respect and maintain the status quo until the controversy shall be settled in the orderly course of judicial procedure. Plaintiff is undoubtedly the de facto officer, because he claims the office and is in possession of it, performing the duties under color of appointment." 5 Waite, Act. & Def. p.

7, § 9; Buckman v. Ruggles, 15 Mass. 180; Com. v. McCombs, 56 Pa. St. 436; State v. Howe, 25 Ohio St. 588; Braidy v. Theritt, 17 Kan. 468.

A recent work, entitled American & English Decisions in Equity (volume 3, p. 440), lays down the principle, and quotes the following authority, and sustains it: "The actual incumbent of an office, whether de jure or de facto, if duly qualified, and if in office by virtue of a certificate of election issued by the proper officers, will be protected by injunction against unlawful interferences with his possession thereof" (Brady v. Sweetland, 13 Kan. 41; Braidy v. Theritt. 17 Kan. 469; Guillotte v. Poincy, 41 La. Ann. 333, 6 South. 507; Palmer v. Foley, 45 How. Prac. 110; State v. Superior Court [Wash.] 48 Pac. 741); as, by illegally electing another in his stead (Wheeler v. Board of Fire Com'rs, 46 La. Ann. 731, 15 South. 179); or by removing him without authority (Armatage v. Fisher, 74 Hun, 167, 26 N. Y. Supp. 364). It will also sometimes interfere to protect the interests of the public; e. g. when two different bodies claim to act as the common council of a city. Kerr v. Trego, 47 Pa. St. 292.

The plaintiffs in these actions are all officers "de facto," if not "de jure," claiming the possession of their offices and performing the duties under color of appointment. I therefore reach the conclusion that the plaintiffs have a right and interest involved in the offices they hold, and that that right and interest is questioned by the defendants in these cases, and that the only legal remedy they have to protect themselves in the enjoyment of their various offices, as against those who are seeking to oust them, is the restraining power of this court to prevent interference with their possession until the titles to the offices have been settled by due course of law.

It follows from what I have said—First, that the act known as the "Civil Service Act" is constitutional; second, that congress has not delegated to the president and the commission legislative powers; third, that by rule 3, § 1, the internal revenue service has been placed under the civil service act and rules made in pursuance of it; fourth, that the plaintiffs in these actions are officers of the government in the internal revenue service; fifth, that they cannot be removed from their positions except for causes other than political, in which event their removal must be made under the terms and provisions of the civil service act and the rules promulgated under it, which, under the act of congress, became a part of the law; sixth, that the attempt to change the position and rank of the officers in these cases is in violation of law; seventh, that a court of equity has jurisdiction to restrain the appointing power from removing the officers from their positions if such removals are in violation of the civil service act. For the reasons assigned, the demurrers to the bills will be overruled.

I come now to consider the defense raised by the answers, other than the questions of law which were disposed of on the demurrers. The main question for consideration is a question of fact. The contention of the defendants is that they were not served with the injunction before the commissioner had attempted to vacate the positions of gauger and storekeeper by the transfer or assign-

ment of others to the positions of Ruckman, Butler, and Berry. From the answer of Collector White, as well as from his affidavits, and of the commissioner, it appears that there was, for some reason, hasty action in regard to these officers. The action by the commissioner was taken by him on the evening of September 30th, by wire, when he notified the plaintiff Ruckman of his transfer, and the plaintiffs Butler and Berry of the revocation of their assignments. The collector claims that he was present on the morning of October 1st to execute the telegraphic order of the commissioner. As we have before said, these plaintiffs, being officers of the government, were not removable at the will or caprice of the commissioner; and, the commissioner also being an officer of the government, his action in this matter must conform to the law, and not be in violation of it. The evidence does not show that the commissioner sent any commissions to the defendants Thayer and Sutton, who were assigned to take, respectively, the offices of gauger and head storekeeper, before the time that they were served with the notice of the injunction restraining them from interfering with the possession of the incumbents. No officer in charge of an official position would be justified in turning over his position to his successor until that successor had appeared with his commission, and taken the oath, and given bond, as required by law. The evidence does not disclose that a single one of any of these prerequisites of the law had been complied with before this service of the injunction. It is very apparent that what was done in regard to these removals was done in haste. One thing is clear both from the answer and the affidavit of Collector White: that he does not deny the fact that he knew of the intended application for an injunction or that the injunctions had been allowed. This is a significant fact, tending to show either that he was very ignorant of what was going on, or that he carefully avoided committing himself either as to the application or the pendency of the injunction. But he must have known of the allowance of the injunction in the Butler case, which was allowed in term time, in open court, on the 29th day of September; and the evening of the very next day there was an attempt to transfer Ruckman, and to revoke the assignment of Butler. It cannot be doubted that he knew of the Butler injunction; hence his effort to have Ruckman transferred and Berry's assignment revoked before they secured injunctions. If he knew of the allowance of the injunctions, he was bound to respect them as much as if he had been served with notice.

Upon the question of notice and service of the order of injunction there is some conflict in the evidence. I will consider the evidence in the cases of Butler and Ruckman together, as the same affidavits apply to both cases. Ruckman, who was head storekeeper, swears that he did not surrender his possession; that, at the time the injunction was served on White, he was in possession of his office, discharging its duties; that the did not take upon himself and discharge the duties of additional storekeeper, the position held by Butler; that he only received notice of his transfer from head storekeeper to additional storekeeper at 10:55 a. m., October 2, 1897; and that this information was contained in a letter from the collector, mailed

from Parkersburg at 4 p. m. of October 1st. He further states that Sutton admitted to him on the 1st day of October that he had received no authority from the defendant to act as storekeeper, and that the authority reached him on the morning of October 2d. Ruckman could not have acted as additional storekeeper, for the reason that his assignment was canceled by wire October 2d, the same day that he received notice that Sutton was to take his place. Sutton was to take Ruckman's place, and Ruckman was to take Butler's; but Ruckman's place was never vacant, or, if it was, he was directed by wire on the evening of October 2d to remain in charge of the warehouse until further orders. It is apparent that Sutton never took possession of the warehouse, or, if he did, he was superseded by the order directing Ruckman to remain in charge, which, by its terms, shows that he was to continue in his position, and not to vacate it. Butler testifies that he was in the actual service of the government at the time the injunction was served on White, and that Ruckman did not take his position, nor did he (Ruckman) perform the duties of additional storekeeper, for the reason that he had been served with the order of injunction, and declined to perform the duties of the office held by affiant. The deputy marshal says that the process was served on Ruckman on the evening of the 1st of October. Faulkner proves that Berry handed a letter to Ruckman on the morning of the 2d of October, authorizing Ruckman to act as additional storekeeper. Ruckman swears that, at the time of the service of the injunction in this case upon Sutton (who admits that it was about 9 o'clock on the night of October 1st), he was performing and discharging the duties of head-storekeeper at the distillery. The affidavits of White and Sutton contradict the sworn statements of Butler, Ruckman, Faulkner, and the deputy marshal. The weight of evidence as to the notice seems to be, and is, with the plaintiffs. It is unfortunate this this conflict should have occurred. One thing is evident: that Butler has never surrendered his position, and, so far as the defendant Ruckman is concerned (who does not claim it, but who insists upon his right to hold the position of head storekeeper), Butler holds his position adverse to Ruckman.

In the case of Berry, gauger, the same character of conflicting evidence exists as in the cases just passed upon. Berry denies that Thayer entered upon the duties of gauger on the 1st day of October, but swears that he was in possession of the property as gauger. Berry states that on October 2, 1897, Thayer came out to the distillery, and, after asking him if he was the gauger in charge, showed him a telegram purporting to come from the commissioner of internal revenue, assigning him as gauger at said distillery. This affidavit is supported by the affidavits of Faulkner and McMahan. It is contradicted by White and Thayer as to the time when Thayer took possession of the office, and as to the time of the service of the injunction. The marshal testifies that they were served the evening of October 1st with a copy of the injunction. Faulkner and McMahan sustain Butler as to what occurred on the morning of the 2d day of October, from which it clearly appears that Thayer came that morning to take possession of the office. The only two disin-

terested witnesses to all of these occurrences, and particularly as to the time of the service of notice, are Faulkner and McMahan. Both of these witnesses sustain Ruckman, Butler, and Berry. The affidavits of both White and Thayer say they were at the distillery on October 1st, and that Berry was not there, and could not therefore turn over the possession of any government property in his charge to Thayer. But White says there was no government property to turn over. The commissioner required him to turn it over, but the collector says there was none to turn over. By reference to the "Regulations and Instructions Concerning the Tax on Distilled Spirits," under the Revised Statutes of the United States, and subsequent acts, issued February 19, 1895 (pages 14 and 15), it will be seen: "That gaugers are made custodians of cistern rooms, * * * and that under no circumstances will they entrust the key to the lock on the door of the receiving room to any person other than the collector of the district." A pertinent question arises: Did Berry turn the keys of the cistern room over to Thayer? It is not claimed that he did, but, on the contrary, Berry states that "on the 2d day of October I was still in the possession of the property of the government, as well as the keys, which, as such gauger, it is my duty to hold"; which contradicts the statements of Thayer and White as to the possession of the office. Another pertinent question is: What became of the gauger's outfit, consisting of box containing hydrometer cups, hydrometer, and stems, with which each gauger is supplied, which is the property of the government? The law says: "Standard hydrometers * * * are supplied for the use of internal revenue gaugers, at the expense of the government." Regulations and Instructions Concerning Tax on Distilled Spirits, p. 123. Did Berry have any distilling stamps, and did he turn over any to Thayer? Id. p. 114. I might refer to other things to show that every gauger is in possession of property of the government, and, when he is removed, must turn it over to his successor in office. No outfit was turned over to Thayer, which shows that possession was not surrendered by Berry to Collector White or Thayer. It is apparent that Collector White is, at least, under a great misapprehension as to what is the outfit of a gauger when he says in his affidavit of October 19, 1897, that "Berry had no property in his possession to turn over to the defendant Thayer, to complete Thayer's assignment." He may entertain honestly that conviction, but I must hold that it is a mistaken conviction, and does not accord with the statutes cited, supra.

I reach the conclusion that the preponderance of evidence is with the plaintiffs, and that neither the gauger nor storekeepers have ever vacated or surrendered their offices or positions; that, in contemplation of law, they are in the legal custody of their offices, and can only be displaced by proceedings instituted under the executive order of July 27, 1897; that the offices not having been surrendered, and the injunction being served while plaintiffs were in possession, it was effective to prevent the interference of the defendants with the plaintiffs in the possession of their offices. I deem it unnecessary to discuss the competency of the plaintiffs for their positions,

though the evidence tends strongly to show that they were fully competent, having served in those positions since 1893.

One other position of the plaintiffs remains to be noticed, and that is that under the legislative and judicial act of 1885, re-enacted in 1886, the collector is prohibited from recommending to the secretary of the treasury, for appointment, more officers of this class than 15 per cent. in excess of the number engaged in performing the duties at the time. It is very clear from the affidavit of Ruckman that the act has been violated, but it is not necessary to rest the case upon this position. I think that both the law and the facts are with the plaintiffs, and the injunctions heretofore awarded must be made perpetual.