**UNITED STATES ex rel. CROW v. MITCHELL et al.**

No. 6835.

United States Court of Appeals for the District of Columbia.

Decided Feb. 15, 1937.

Argued Jan. 4, 5, 1937.

David R. Crow, of New York City, for appellant.

Leslie C. Garnett, U. S. Atty., H. A. Schweinhaut, Asst. U. S. Atty., James C. O'Brien, Hampson Gary, Gen. Counsel, Federal Communications Commission, and Frank Roberson, Asst. Gen. Counsel, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

GRONER, J.

The Federal Communications Commission was created by Act of Congress of June 19, 1934 (48 Stat. 1064, see Title 47, U.S.C.A. § 151 et seq.). The purpose was to consolidate into one regulatory commission the regulation of interstate and foreign communications by wire and radio, etc. Section 4(f) of the act (48 Stat. 1067) provides that, subject to the provisions of the civil service laws and the Classification Act of 1923 (42 Stat. 1488, as amended, Title 5 U.S.C.A. §§ 661–674), the Commission shall have authority to appoint attorneys, examiners, and other employees necessary in the execution of its functions. At the time of the creation of the Commission, there was not available a suitable civil service register from which to select attorneys for the Commission's law department. Pending the holding of an examination to establish such a register, and pursuant to section 2 of rule 8 of the Civil Service Commission, authority was granted for the temporary appointment of attorneys. Approximately a year later the examinations prescribed by the Civil Service Commission were held, and the applicants graded and a register established. The temporary appointees in the law department of the Communications Commission took the examination and all successfully passed, but none was included within the first three names at the head of the civil service eligible list.

Petitioner also took the examination and was graded 95.48 for the position of associate attorney and 98.30 for the position of assistant attorney, his actual grading marks in each class having been increased 10 points because he was a disabled war veteran seriously wounded in action in line of duty and honorably discharged from the United States Army. Executive Order No. 5068. As a result of this grading, petitioner was placed at the head of the list of persons eligible for the position of associate attorney and also for the position of assistant attorney of the Communications Commission. However, on September 26, 1935, the President, at the request of the Commission, issued Executive Order No. 7201 as follows:

"By virtue of the authority vested in me by the provisions of the last sentence of the eighth paragraph of sub-division second of section 2 of the Civil Service Act of January 16, 1883 (ch. 27, 22 Stat. 403, 404 [Title 5 U.S.C.A. §§ 632, 633, 635]), it is hereby ordered that the following-named persons may be appointed to appropriate positions in the Federal Communications Commission without regard to their standings on the Civil Service registers for professional positions: [then followed the names of the temporary appointees].

"The above-named persons have passed with creditable marks the prescribed Civil Service examinations for positions with the Federal Communications Commission. They have for the greater part of a year, under temporary appointments in the absence of Civil Service eligibles, rendered efficient service and have thereby become valuable to the Federal Communications Commission. It is desirable, therefore, in the interest of good administration and economy that their services be retained."

The Commission thereupon made the temporary appointments permanent and returned the certified list to the Civil Service Commission with the notation: "No appointments are being made at the present time." Petitioner thereupon applied to the lower court for a writ of mandamus—

1st, to direct the Commission to terminate the employment of the temporary appointees;

2nd, to require the Civil Service Commission to desist from further certifying the pay rolls of such employees;

3d, directing the Civil Service Commission to certify again to the Communications Commission petitioner's name;

4th, directing the Communications Commission to appoint persons from this list;

5th, directing the Communications Commission to refrain from continuing in its employ the persons appointed pursuant to the Executive Order of the President;

6th, directing the Communications Commission to appoint to the positions persons properly eligible, including petitioner, as their names appear on the register of the Civil Service Commission; and

7th, requiring the Communications Commission to continue in effect the Civil Service list until the positions in question are filled by proper eligibles, including petitioner.

A rule to show cause was issued; the Communications Commission answered, grounding its defense on the President's Executive Order and setting out other

grounds of defense which, in the view we take of the case, it is not necessary to mention in detail. The Commission prayed that the rule be discharged and the petition dismissed. The Civil Service Commission likewise filed an answer to the rule, setting out substantially the same facts and defenses. Petitioner demurred to the answers. The demurrer was overruled and, petitioner electing to stand thereon, the petition was dismissed.

R.S. § 1754 (as amended, 41 Stat. 37, 5 U.S.C.A. § 35) is as follows:

"Persons honorably discharged from the military or naval service by reason of disability resulting from wounds or sickness incurred in the line of duty, shall be preferred for appointments to civil offices, provided they are found to possess the business capacity necessary for the proper discharge of the duties of such offices. In making appointments to clerical and other positions in the executive branch of the Government in the District of Columbia or elsewhere preference shall be given to honorably discharged soldiers, sailors, and marines."

This statute is expressly made a part of the Civil Service Law (section 7, title 5 U.S.C.A. § 638). On this appeal petitioner insists that in view of the preference granted by statute to him as a disabled veteran-eligible he is entitled to appointment as an attorney in the Communications Commission if upon examination by the Commission he is found to possess the business capacity necessary for the proper discharge of the duties of the office. He says that none of the temporary appointees is a disabled veteran, and consequently there is a mandatory duty on the part of the Commission to give him the benefit of the preference created in his favor by the law. And he further says that, notwithstanding this statutory preference, the Commission has failed to carry out its duty to ascertain whether he possesses the business capacity, etc., as a preliminary to his appointment.

Enough has been said, we think, to show that the appeal involves, at most, two questions: First, is the Executive Order of September 26, 1935, valid? Second, even if invalid, or of doubtful validity, does jurisdiction exist in a court to grant mandamus?

It will be seen by reference to Executive Order No. 7201, which we have quoted, that the President rests his authority for the order on the last sentence of the eighth paragraph of subdivision second of section 2 of the Civil Service Act of 1883 (5 U.S.C.A. § 633). The language of that sentence is as follows:

"Any necessary exceptions from said eight fundamental provisions of the rules shall be set forth in connection with such rules, and the reasons therefor shall be stated in the annual reports of the commission."

Precisely what was in the mind of Congress in the use of this language is not apparent from its terms; but from the fact —of which we take judicial notice—that various Presidents have from time to time issued executive orders pursuant to which designated persons were brought into the classified civil service without regard to the eight fundamental rules, we assume that these words have been, in practice at least, construed to include the sort of action taken in the instant case. This was the view taken at one time by Attorney General Bonaparte (26 Op.Attys.Gen. 460). In answering affirmatively the question whether or not a retired officer of the United States Revenue Cutter Service could be appointed permanently by the President in the Life Saving Service of the Treasury Department without compliance with the civil service rules, he said:

"The civil-service act authorizes the making of special exceptions from certain fundamental provisions of the rules promulgated thereunder, provided the exceptions are set forth in connection with the rules and the reasons therefor stated in the annual reports of the Civil Service Commission."

Though, at a later date he reached the different conclusion "that under the existing civil service rules all places in the executive civil service, except those mentioned in schedule 'A,'[1] and except persons employed merely as laborers, and persons whose appointments are subject to confirmation by the Senate, must be appointed as a result of open competitive examinations, held under the provisions of the law." (26 Op.Attys.Gen. 502, 507.)

But neither in the briefs nor in the argument in this case was there any re-

---

[1] Private secretaries to cabinet officers, teachers at Naval Academy, wardens of jails, Indian Service, etc.

liance by the Commission on this source of power in justification of its action. Reliance was had, instead, on section 2 of article 2 of the Constitution, which provides:

"He [the President] shall have Power, * * * and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

The Commission, as we have said, relies upon this constitutional provision as giving validity to the President's Executive Order and as conferring on the President, the courts, and the heads of Departments the exclusive constitutional prerogative of filling all offices created by law. So far as we are advised there is no case in point, but the question of the President's power under article 2 arose in General Grant's administration and was discussed at length in an opinion of the then Attorney General (13 Op.Attys.Gen. 516). The question arose as the result of an abortive effort to create a civil service commission under an Act of Congress passed in 1871 and was, whether an act, prescribing the adoption of rules requiring heads of Departments to appoint persons named by a civil service board to a vacancy in the civil service, was valid. The answer was that the mode of selection, if discretionary with the President, would encounter no constitutional objection. In other words, that a rule which would permit rather than require the President to adopt that test as a way of finding out the fittest person for the vacant office would not impinge his constitutional authority. The test—said the Attorney General—of a competitive examination may be resorted to in order to inform the conscience of the appointing power, but cannot be made legally conclusive upon that power against its own judgment and will. But even if we give effect to this conclusion, it will not answer the question involved here, for we are dealing with a situation concerning employees of government who are not "officers," a class of employees not intended to be and not required to be appointed by the President or by a head of Department— Burnap v. United States, 252 U.S. 512,

516, 40 S.Ct. 374, 64 L.Ed. 692; United States v. Mouat, 124 U.S. 303, 306, 8 S. Ct. 505, 31 L.Ed. 463—and therefore not within the intendment of article 2. In the growth and expansion of the government the roster of minor employees has steadily increased, and it is not going too far to say that the greater percentage of them receive appointment from some other source than the President, the courts, or one of the members of the cabinet. Congress—and the President by Executive Order, as we assume—have frequently delegated the power of appointment to subordinate officers of government; and, while it may be argued as to such appointments that they are in effect made by the head of the department, United States v. Hartwell, 6 Wall. 385, 18 L.Ed. 830, the same may not be said of appointments made by an independent board or commission created by Act of Congress and authorized to appoint its own staff of minor officials and employees. And it is also correct, perhaps, to say that when such authority is contained in an Act of Congress it has its source from some constitutional power other than that contained in article 2. And if this be conceded, it would follow that that article does not embrace the whole power of the Congress to legislate with relation to the appointment of minor officials of government particularly where they are appointed to offices in some commission or board. Judge Jackson of the Circuit Court for the District of West Virginia, in the case of Butler v. White, 83 F. 578, 581—a civil service case of removal from office—found this power even as to appointments in the executive department in article 1, section 8, which vests in Congress power "to make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Judge Jackson said that under this provision Congress as early as the 27th day of July, 1789, passed an act that the head of each department is authorized to prescribe regulations, not inconsistent with law, for the government of his department, the conduct of its officers and clerks, the distribution and performance of its business. The power thus conferred, he thought, was in no sense a delegated power of legislation, but was the proper exercise by Congress of its legislative power to supervise the conduct of executive officers and confer au-

thority for the distribution and performance of the executive business of the Government. "I assume," he said, "that, when congress passed these acts [Civil Service Act], it did determine for itself what was necessary and what was proper; that there was a necessity to remedy the evil growing out of the existing appointments to office; and that the acts passed were constitutional, and therefore proper. Is it not competent, and clearly within the legitimate scope of the powers of congress, under the constitution, to remedy an existing evil? If so, did congress, in the passage of these acts, exceed its legitimate power under the constitution? I think not. Under our system of government, congress, by law, is vested with the power alone to remedy existing evils; but it is the duty of the executive, when congress by an act applies a remedy, to see that the act is faithfully enforced. When congress undertakes to apply a remedy to an evil by repealing an existing law, or by amending the law, or by the passage of an act which has for its object an improvement of the civil service of the country, can it be said that congress has exceeded its power? I think not."

In considering this phase of the subject, it should be remembered that the employees in question are employees of a commission in which is vested by congressional action quasi judicial powers and discretion and whose employees, therefore, may be said to be in a class different from the ordinary civil service connected with the executive departments of the government. In these circumstances to hold that Congress may not, in the creation of such a commission charged with the performance of duties under the commerce clause of the Constitution (article 1, § 8, cl. 3), prescribe the terms, qualifications, and conditions of employment, would be going much farther than we are prepared to go. And, when considered in that aspect, petitioner's claim that he is entitled to the preferential benefits of the congressional mandate would seem to be well founded. On the other hand, to say that the President, in whom the Constitution vests the executive authority, may not when he declares the public service demands it in a particular case, suspend a rule of the civil service—a practice which, as we have seen, has been indulged without challenge from time to time for half a century—would involve deciding a question which, in view of the uncertain language of the statute on the one hand and the established practice on the other, is by no means so free from doubt as to be controlled by mandamus. Work v. U. S. ex rel. Rives, 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561.

There are other reasons why the petition should be denied.

The several prayers, when considered together, in effect ask us to require the Commission to discharge certain attorneys now employed in its law department and to require the Commission to consider for appointment to such positions petitioner and others immediately below him on the eligible register. But petitioner admits, as of course he must, that the office which he seeks is now filled by an incumbent appointed by the Commission who is discharging the duties and has been discharging them since the original organization of the Commission. To grant the relief asked, in such circumstances, would be in effect to try the title to the office so held, and this is not the province of mandamus. That writ may not be granted with the object of putting petitioner in possession of an office until it has been established by judicial process that there is a vacancy to be filled. The Court of Appeals in New York, in People ex rel. McLaughlin v. Board of Police, 174 N.Y. 450, 67 N.E. 78, 95 Am.St. Rep. 596, went to the extent of saying that even where the title of a petitioner to an office is clear, that fact does not except him from the general rule that when someone is in actual possession under color of right, mandamus will not lie to determine the title. Certainly, the nearly universal rule, goes to the extent of holding that the writ is improper in all cases in which the title to office is in dispute.

Then again mandamus cannot issue to interfere with the executive officers of the government in the exercise of their ordinary official duties even where those duties require an interpretation of the law. U. S. ex rel. Dunlap v. Black, 128 U.S. 40, 9 S.Ct. 12, 32 L.Ed. 354. And this, in turn, grows out of the fact that courts always should proceed with extreme caution where the granting of the writ would result in interference by the judicial department with the management of the executive department of the government, or—as was said by the Supreme Court in U. S. ex rel. Redfield v. Windom, 137 U.S. 636, 644, 11 S.Ct. 197, 200, 34 L.Ed. 811—courts proceed in such cases with extreme caution even where the petition for the writ is to

810

perform a purely ministerial act, i. e., "In a case, for instance, where the intention of the officer, though acting within the scope of his duty, had been frustrated by a clerical mistake (United States v. Schurz [102 U.S. 378, 26 L.Ed. 167], supra); or where the case is one of doubtful right (N. Y. Life and Fire Ins. Co. v. Wilson, 8 Pet. 291, 302 [8 L.Ed. 949]); or in a case where, the relator having another adequate remedy, the granting of the writ may in this summary proceeding affect the rights of persons who are not parties thereto, or where it will be attended with manifest hardship and difficulties."

For these reasons, we are of opinion that the refusal of the District Court to grant the relief was correct.

Affirmed.